In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-3104

JAMES E. WARD,

*Petitioner-Appellee*,

*v.*

JERRY L. STERNES,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-C-2145—**Michael P. McCuskey**, *Judge.*

ARGUED JANUARY 15, 2003—DECIDED JULY 8, 2003

Before MANION, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* When asked "Are you black?" and "Are you white?" by a neurologist, petitioner James E. Ward, an African-American male, earnestly answered "Yes" to both questions. Similarly, with "Yes" and "No" answers Ward indicated that a hammer was good for both cutting wood and pounding in nails, that good rubber boots both keep water out and let water in, that two pounds of flour weigh more than and less than one pound of flour, and that both boats and stones sink in water. Ward has a condition known as aphasia, resulting from blunt head trauma he suffered in 1993, which manifests itself in this disconnect between questions asked of Ward and the answers he gives.

In this appeal from the grant of Ward's habeas corpus petition, we ask whether an Illinois appellate court committed unreasonable error when it concluded that Ward's statement, "I guess, I don't know," constituted a knowing and intelligent waiver of his fundamental right to testify at his trial for the 1994 murder of his wife. The district court held that the state appellate court applied an overly deferential standard of review to the trial court's ruling that "I guess, I don't know" meant "Yes, I waive my right to testify," and erroneously supplanted trust in the defense counsel's recommendation that Ward not testify for Ward's personal understanding of his fundamental rights. The state argues that in granting Ward's motion, the district court failed to give statutorily required deference to the Illinois appellate court, which might have reached a different conclusion than the district court would have, but did not reach that conclusion unreasonably. Like the district court, we find that the Illinois appellate court committed unreasonable error when it upheld the trial court's ruling that Ward actually understood his right to testify and personally, knowingly, and intelligently waived that right. We therefore affirm.

## HISTORY

In the early morning hours of September 9, 1994, Suriego Walker, Ward's stepson, awoke to the sounds of screaming coming from the living room of his house. When he got there, Suriego saw his stepfather Ward stabbing his mother Evelyn repeatedly with a kitchen knife. He struggled with Ward and disarmed him. After he was subdued, Ward rambled and mumbled, at times incoherently, at times pleading with Suriego to kill him.

For the better part of the previous evening in fact, Ward had been wandering about the house incoherently rambling, getting himself angry and calming himself down in

a repeating cycle. Ward started behaving this way after losing a fight to Suriego's cousin, Leroy Turner. We don't know why the fight broke out, only that it happened while Ward was intoxicated, after he, Evelyn, and a friend, Tony Clark, had been drinking beer throughout the afternoon at the house. (Ward had a blood alcohol level of .234 at the time of his arrest.) We do know, however, that the fight ended with Turner hitting Ward in the head first with a chair and then with a brass object, knocking Ward temporarily unconscious. When Ward came to, he was bleeding from his temple. Over the next few hours, he intermittently and violently accused his wife and the others present of "jumping him." It was after one of these outbursts that Ward began stabbing Evelyn.

Ward was arrested and charged with his wife's murder. On April 4, 1995, Ward was declared unfit to stand trial. But at a hearing on February 21, 1996, Ward's fitness was deemed restored. His symptoms were judged to be controllable through the use of psychotropic drugs, but the fitness report cautioned that "one must exercise patience and listen closely to what Ward is saying" as a result of his language-processing handicap. On August 19, 1996, Ward's trial began.

The only disputed issue at Ward's trial was his sanity. Because of an earlier, traumatic injury that Ward had suffered in 1993, nine months before the murder, Ward had sustained "very marked" abnormalities to the left frontal and temporal lobes of his brain. Neurologists testified at trial that the temporal lobe controls language and that the frontal lobe governs inhibition. They further testified that Ward's temporal-lobe injury resulted in his aphasia (as described above) and that the his frontal-lobe injury severely impeded his ability to control his impulses. The district court observed that it's also possible that the additional injuries that Ward suffered on the day of the killing inflicted further brain damage, as

Ward showed no ability to recall the events of that day beyond his fight with Turner.

The defense called two psychiatrists to testify that Ward was legally insane when he killed his wife. Both testified that Ward suffered from dementia as a result of the 1993 blunt head trauma and that the dementia made him unable to control or appreciate the criminality of his conduct during his wife's murder.

In response, the state argued that Ward's inability to restrain his impulses on the day of the murder was caused by his voluntary intoxication rather than any mental defect. On cross-examination, one of the defense's psychiatrists, Dr. Lawrence Jeckel, agreed with the prosecution's suggestion that alcohol was a "necessary component" of Ward's inability to control his actions. But the other psychiatrist, Dr. Arthur Traugott, testified that Ward's dementia would have made it highly unlikely that he would have been able to control his violent impulses towards his wife even if he had been sober. Dr. Traugott further opined that, due to his condition, Ward probably lacked the ability to control his use of alcohol or drugs anyway. The state introduced no expert testimony to rebut that of Drs. Traugott and Jeckel.

On August 21, 1996, the defense concluded its case without putting Ward on the stand. The state questioned whether Ward had voluntarily waived his right to testify and requested that the court make a record of the waiver. Ward's counsel admitted that it wasn't his client, but he who had made the decision to keep Ward off the stand. He further told the court that he didn't believe he could have an informed discussion with Ward about the decision, since most of his prior exchanges with his client were one-sided, generating only an occasional "uh-uh" response from Ward. On the court's suggestion, however, defense counsel agreed to discuss the matter with him.

In chambers the next day, the court asked Ward whether his attorney had talked to him about not testifying in court and whether he agreed with that decision:

> THE COURT: [Defense counsel] has indicated that it is his best advice and professional judgment that you not be called to testify yourself and he stated that he has talked to you about that. Is that true?
>
> WARD: Yeah.
>
> THE COURT: Do you agree with that?
>
> WARD: I don't know what's all going to happen to me. I just been sitting around here. My wife is gone and my kid is gone and they beat me up all the time. I don't know what I'm going to do now.
>
> THE COURT: Well, we are really not here to discuss that. We just want to make sure that you're in agreement that it is a good decision that you not testify.
>
> WARD: I guess. I don't know.
>
> THE COURT: [After dismissing Ward] That's the best we will ever do.

Satisfied with this colloquy, the trial court allowed the defense to rest without putting Ward on the stand. The jury rejected Ward's insanity defense and returned a verdict finding Ward guilty, but mentally ill ("GBMI verdict").

Immediately after trial, Ward asked his attorney why he had not been allowed to testify. Counsel then filed a post-trial motion alleging that Ward had not validly waived his right to testify, because he had not understood his counsel's advice.

A hearing on this post-trial motion was held on September 23, 1996. The court asked Ward whether he recalled being asked if he wanted to testify at trial. He replied, "No, I didn't know. I just said yes. That's all I know. I didn't

know what I can remember, what they saying, so just said yes." When asked whether he knew "what it means to testify," he replied, "I don't know. I'm trying to find something to tell me what I know it is, but I couldn't understand what it is." So the court asked, "Did you want to tell your story?" and Ward replied, "Yes."

The court then asked Ward why he didn't tell his story. Instead of giving a reason, Ward told the court his story, and the transcript of the hearing is filled with four pages of Ward's repeating account of the events that evening, which starts and ends with the fight between him and Turner and never describes his wife's murder. The court cut him off, and after hearing arguments, denied Ward's post-trial motion:

> It was clear that [defense counsel] had advised [Ward] strongly not to testify. We went back in chambers and had the defendant back there and questioned him about that, and he responded in a way that he has responded to most questions from the Court or counsel during the course of these proceedings, that yes, he was just trying to do the best he could and he would go along with that. I found at the time that he understood what [defense counsel was] talking about . . . and that in his own way he concurred in that, and I have no reason to change my mind at this time.

Ward received a 40 year sentence.[1] On direct appeal,

---

[1] Under Illinois law, a defendant convicted under a GBMI verdict is subject to any sentence that could have been imposed under a guilty verdict for the same offense, including the death penalty. *People v. Morris*, 603 N.E.2d 1196, 1200 (Ill. Ct. App. 1992). If found GBMI, the defendant is remanded to the custody of the Illinois Department of Corrections. The Department must hold

(continued...)

Ward argued (1) that the jury's rejection of the insanity defense was against the manifest weight of the evidence; (2) that he did not knowingly and voluntarily waive his right to testify; (3) that the Illinois statute permitting a GBMI verdict (725 ILL. COMP. STAT. ANN. 5/115-4(j) (1996)) was unconstitutional; and (4) that the trial court erred in giving the jury a nonpattern instruction on voluntary intoxication. The Illinois appellate court rejected all these challenges and affirmed Ward's conviction. *People v. Ward*, No. 4-96-0768 (Ill. App. Ct. July 31, 1998). On August 25, 1998, the Illinois appellate court denied Ward's petition for rehearing, and Ward's petition for leave to appeal to the Illinois Supreme Court was denied on June 2, 1999. His petition to the U.S. Supreme Court was denied on October 12, 1999. Having exhausted the remedies available through the state, Ward brought this habeas corpus petition before the district court under 28 U.S.C. § 2254, arguing solely that he did not make a valid waiver of his fundamental constitutional right to testify. The district court granted the writ, *see Ward v. Sternes*, 209 F. Supp. 2d 950 (C.D. Ill. 2002), and this appeal by the government followed.

---

[1] (...continued)

a hearing inquiring into the current need for treatment of the defendant's mental illness and, as a result, may transfer custody of the defendant to the Department of Human Services for hospitalization. *See* 730 ILL. COMP. STAT. ANN. 5/5-2-6(c) (2003). Should the defendant no longer require hospitalization, he is returned to prison to serve out the remainder of his sentence. *Id.* 5/5-2-6(d)(1). Conversely, should the need for hospitalization continue beyond the expiration of his sentence, the state may seek to have the defendant involuntarily committed. *Id.* 5/5-2-6(d)2. The record in this case indicates that Ward is currently in the custody of the Illinois Department of Corrections as a prisoner at the Dixon Correctional Center.

**ANALYSIS**

Under the statutory framework governing federal habeas corpus relief before the passage of the Antiterrorism and Effective Death Penalty Act of 1996, an issue of paramount importance for a federal court to consider in ruling upon a petition was whether the petitioner's challenge raised a question of fact or a question of law. How the claim was classified influenced the level of deference due the state court decision by the federal court. A determination of fact reasonably based upon the record could be set aside by the federal court only if the petitioner presented clear and convincing evidence that the fact was determined incorrectly. 28 U.S.C. § 2254(d) (1995). Questions of law, however, were afforded no deference, and on federal habeas review a court would resolve those issues *de novo*. *See Thompson v. Keohane*, 516 U.S. 99, 107-10 (1995).

But since many square issues did not fit neatly into the round holes of pure fact or pure law, the lower courts struggled over what to do with so-called mixed questions of law and fact. Were these mixed questions to be reviewed deferentially because they were based in part upon the resolution of factual issues made by the state trial courts? Or should federal courts have the province to review the application of federal constitutional principles to individual facts *de novo* in order to maintain control of and to clarify those legal principles? Entering the fray, the U.S. Supreme Court in a series of cases attempted to delineate principles by which federal courts could classify a petitioner's challenges. *Id.* at 110-12; *Miller v. Fenton*, 474 U.S. 104, 111-14 (1985); *Brewer v. Williams*, 430 U.S. 387, 396 & n.4 (1977); *cf. Ornelas v. United States*, 517 U.S. 690 (1996) (tackling the fact-law distinction within the context of what standard of review governs a defendant's direct appeal of a district court's finding that arresting officers had reasonable suspicion to

stop and question defendants and had probable cause to search them).

According to the Court, the distinction would turn upon how greatly the challenged decision rested upon subsidiary findings of "basic, primary, or historical facts" (entitled to deference) as opposed to the application of constitutional principles to those facts (no deference). *Thompson*, 516 U.S. at 111-12. In other words, the Court clarified that trial-court findings regarding "what happened" issues may warrant a presumption of correctness, but that its resolutions of "ultimate questions" were entitled to no deference because of their "uniquely legal dimension." *Id.* (citing *Miller v. Fenton*, 474 U.S. 104, 115-16 (1985)). Thus, a federal court on habeas review was free to decide ultimate questions—such as whether a suspect's confession was rendered voluntarily, whether counsel's assistance was constitutionally defective, and whether a defendant waived his Sixth Amendment right to counsel—without deference to the state court's prior resolution. *Id.* at 112 (citing *Miller*, 474 U.S. at 116, *Strickland v. Washington*, 466 U.S. 668, 698 (1984), and *Brewer*, 430 U.S. 387, 397 & n.4). Even so, the Court admitted that the proper characterization of questions would remain "slippery." *Id.* at 464 (observing that the Court had previously extended § 2254(d)'s presumption of correctness to questions whose resolution extended beyond mere determinations of "what happened," such as competency findings and juror impartiality, when it depended heavily on the trial court's appraisal of witness credibility and demeanor) (citing *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (*per curiam*) and *Wainwright v. Witt*, 469 U.S. 412, 429 (1985)).

Under this slippery pre-AEDPA framework, we had observed that "whether a waiver is intelligently made is a factual question, because whether an individual understood his or her rights is an inquiry into his state of mind."

*Perri v. Director, Dep't of Corrections*, 817 F.2d 448, 451-52 (7th Cir. 1987) (observing that whether petitioner understood and knowingly and intelligently waived his *Miranda* rights is a question of fact entitled to pre-AEDPA § 2254(d) presumption) (citing *Miller*, 474 U.S. at 113). *But see United States v. Alton Mills*, 122 F.3d 346, 349-50 & n.3 (7th Cir. 1997) (deciding that ultimate question of the voluntariness of the waiver of *Miranda* rights subject to *de novo* review on direct appeal and collecting cases regarding the same). Such a classification was necessary at the time to bring the question within then-§ 2254(d)'s deferential review. *See Miller*, 474 U.S. at 114-15 (discussing the appropriateness of resolving close questions concerning the fact-law distinction in favor of extending deference to the trial court where the issue involves the credibility of witnesses and turns upon an evaluation of demeanor, notwithstanding the "intimate connection" between such determinations and ultimate constitutional guarantees).

In a post-AEDPA world, however, where state court adjudications on the merits of petitioner's challenges are entitled to deference regardless of whether we classify them as questions of fact, law, or mixed, the outset classification is of diminished importance. Under the Act, a federal court may grant the writ of habeas corpus if the challenged state-court decision either "was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (2003). Otherwise, a federal court may set aside a state court "decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). Along the way, determinations of factual issues made by the state court are presumed correct in federal habeas corpus proceedings, unless the petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

To run afoul of § 2254(d)(1)'s contrary-to standard, the state court must have either (i) adopted a rule that contradicts the governing law of the U.S. Supreme Court or (ii) on a set of facts materially indistinguishable from those at issue in the applicable Supreme Court precedent, reached a different result. *Williams v. Taylor*, 529 U.S. 362*, 405 (2000); *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000). A state-court decision also may be set aside under § 2254(d)(1) if the state court correctly identified the governing Supreme Court precedent, but unreasonably applied it to the unique facts of the prisoner's case. *Williams*, 529 U.S. at 405. The Supreme Court has explained that an unreasonable application is not the same thing as an erroneous application, *see id.*, even if the error is clear, *see Lockyer v. Andrade*, 123 S. Ct. 1166, 1171-72 (2003). Instead, the state court's decision must have been not only erroneous, but objectively unreasonable. *Id.*

How then should federal courts distinguish between reasonably and unreasonably erroneous applications of clearly established Supreme Court precedent? The standard favors conventionalism over formalism. *See generally* Todd E. Pettys*, Federal Habeas Relief and the New Tolerance for "Reasonably Erroneous" Applications of Federal Law*, 63 OHIO ST. L.J. 731 (2002). Which is to say, it takes for granted that for a given set of facts, there exists the possibility of "several equally plausible outcomes." *Boss v. Pierce*, 263 F.3d 734, 742 (7th Cir. 2001) (citing *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997), and quoting *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997)). Our task is to uphold those outcomes which comport with recognized conventions of legal reasoning and set aside those which do not. *See Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002) ("AEDPA requires that [the state-court decision] be 'unreasonable,' which means something like lying well outside the boundaries of permissible differences of opinion."); *Hall*, 106 F.3d at 749 (opining that

the writ should be granted when the decision is "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary" as to be unreasonable).

Unreasonableness also serves as the touchstone against which state court decisions based upon determinations of fact in light of the evidence presented are evaluated. 28 U.S.C. § 2254(d)(2). As is the case under § 2254(d)(1), a petitioner's challenge to a decision based on a factual determination will not succeed if the petitioner merely evidences that the state court committed error. Instead, he must further establish that the state court committed unreasonable error. And § 2254(e)(1) provides a mechanism by which the petitioner can prove that unreasonableness. If the petitioner can show that the state court determined the underlying factual issue against the clear and convincing weight of the evidence, the petitioner has not only established that the court committed error in reaching a decision based on that faulty factual premise, but has also gone a long way towards proving that it committed unreasonable error. A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision "so inadequately supported by the record" as to be arbitrary and therefore objectively unreasonable. *Hall*, 106 F.3d at 749; *cf. Miller-El v. Cockrell*, 123 S. Ct. 1029, 1041-42 (2003) (rejecting the Fifth Circuit's requirement that a petitioner prove the *unreasonableness* of the state court's decision by clear and convincing evidence).

In sum, regardless if we classify Ward's challenge as raising an issue of pure fact, pure law, or a mixed question of law and fact, we are required under the AEDPA to review the state court's adjudication on the merits of his claim deferentially and set the decision aside only if the court committed unreasonable error. *See Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000) (evaluating under

§ 2254(d)(2)'s "unreasonable determination" clause the petitioner's claim that the state court committed unconstitutional error under the rationale of *Pate v. Robinson*, 383 U.S. 375, 385 (1966), in failing to hold a competency hearing, but observing that its analysis would proceed in similar fashion under § 2254(d)(1)'s "unreasonable application" clause; under either standard, focus of habeas inquiry is whether the state court's decision was objectively unreasonable); *Rivera v. Sheriff of Cook County*, 162 F.3d 486, 489 (7th Cir. 1998) ("Whether the meaning of Judge Strayhorn's oral statement is a question of fact or of state law, the upshot is the same: a federal court may not reach an independent conclusion on the subject, but must respect the state court's resolution."). In doing so, we keep in mind that "deference does not imply abandonment or abdication of judicial review," nor does it "by definition preclude relief." *Miller-El*, 537 U.S. at 1041 ("A federal court can disagree with a state court's credibility determination and, when guided by the AEDPA, conclude that the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."); *see also Mendiola v. Schomig*, 224 F.3d 589, 592-593 (7th Cir. 2000) ("If a state court's finding rests on thin air, the petitioner will have little difficulty satisfying the standards for relief under § 2254."); *Estock v. Lane*, 842 F.2d 184, 186-87 (7th Cir. 1988) (state court's competency finding not entitled to pre-AEDPA § 2254(d)'s presumption of correctness where the factual determination was inadequately supported by the record).

We review the district court's decision to grant habeas relief *de novo*. *Anderson v. Cowan*, 227 F.3d 893, 896 (7th Cir. 2000) (citing *Washington v. Smith*, 219 F.3d 620, 627 (7th Cir. 2000), and *Lieberman v. Washington*, 128 F.3d 1085, 1091 (7th Cir. 1991)). Therefore, we direct our analysis to an examination of the Illinois appellate court's decision.

The Illinois appellate court correctly identified the governing U.S. Supreme Court precedent regarding waivers of the right to testify. It noted that a defendant's right to testify was fundamental. *See Rock v. Arkansas*, 483 U.S. 44, 52-53 & n.10 (1987) ("[A]n accused's right to present his own version of events in his own words" is "[e]ven more fundamental to a personal defense than the right of self-representation"); *see also Rogers-Bey v. Lane*, 896 F.2d 279, 283 (7th Cir. 1990). And it noted that the right is personal to the accused, and not capable of being waived by counsel on the defendant's behalf. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). Further, it concluded that Ward's personal waiver of this fundamental right, which protects the fairness of the criminal proceeding, must have been knowing and intelligent to be valid. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973) ("A strict standard of waiver has been applied to those rights guaranteed to a criminal defendant to insure that he will be accorded the greatest possible opportunity to utilize every facet of the constitutional model of a fair criminal trial."); *see also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("[C]ourts indulge in every reasonable presumption against waiver of fundamental rights, and . . . we do not presume acquiescence in the loss of fundamental rights.") (quotation omitted). Its decision was therefore not contrary to clearly established Supreme Court precedent.

But in determining that Ward's statement "I guess, I don't know" constituted a personal waiver that Ward made knowingly and intelligently, the Illinois appellate court committed unreasonable error. In reaching its conclusion, the Illinois appellate court recognized that "the record makes it clear that [Ward] had little understanding of the strategic implications of his decision." *Ward*, slip op. at 22. Nevertheless, applying the manifest-weight-of-the-evidence standard of review applied at the time in Illinois *Miranda* wavier precedent, *see People v. Bernasco*, 562

N.E.2d 958 (Ill. 1990), and *People v. Scott*, 594 N.E.2d 217 (Ill. 1992),[2] it refused to discuss that evidence or credit it against the trial court's conclusory determination that Ward acquiesced in his counsel's decision. *Ward*, slip op. at 22. Instead, the Illinois appellate court concluded that if a defendant's silent acquiescence of his counsel's recommendation that he not testify is sufficient to support an implied waiver, an express acceptance of an attorney's advice was sufficient to support an express waiver. *Ward*, slip op. at 21-22 (citing *People v. Raso*, 602 N.E.2d 53, 56 (Ill. 1992)). This analysis led the Illinois appellate court, like the trial court before it, inappropriately to substitute the wisdom of Ward's counsel's strategic decision that he not testify for the requirement that Ward personally, knowingly, and intelligently waive his right. The result is a decision that lies "at such tension" with governing Supreme Court precedent and that is "so inadequately supported by the record" as to be arbitrary and unreasonable whether evaluated under the strictures of § 2254(d)(1) or § 2254(d)(2) and (e)(1).

The uncontroverted trial testimony was that Ward's brain injuries severely disrupted his ability to think, reason, take in verbal information, and understand and use language to express his understanding. As the district court noted, "[h]is individual answers to questions posed to him by physicians, his attorney, or the court may have the semblance of coherence and validity, in the sense that they are possible answers to the questions asked. But taken

---

[2] Illinois now in accordance with U.S. Supreme Court and Seventh Circuit precedent recognizes that the "ultimate question" regarding the voluntariness of a *Miranda* waiver is entitled to *de novo* review. *In re G.O.*, 727 N.E.2d 1003, 1009-10 (Ill. 2000) (citing *Ornelas v. United States*, 517 U.S. 690, 697-99 (1996), and *United States v. D.F.*, 115 F.3d 413, 417-19 (7th Cir. 1997)).

together, they make no sense." *Sternes*, 209 F. Supp. 2d at 960. Although Ward was deemed competent to stand trial,[3] his fitness report cautioned that to overcome this severe language-processing deficit, one must expend an inordinate amount of patience with Ward.

Simply put, the trial court did not exercise that level of extraordinary patience in extracting Ward's purported waiver. Under these circumstances, an in-chambers conference on the subject of Ward's understanding of his rights was not an exceptional measure to be credited to the court's patience, but was a required procedure. In other words, there was an indication that Ward was prevented by his own mental deficiencies from exercising his fundamental right to testify, which then necessitated further inquiry from the court. *See United States v. Manjarrez*, 258 F.3d 618, 623-24 (7th Cir. 2001). And more than an equivocal, "I guess, I don't know," in response to the trial court's question of whether Ward was "in agreement" with his counsel's "best advice and professional judgment that [he] not be called to testify [himself]" was required to ensure an accused with severe brain damage was knowingly and intelligently waiving a fundamental right. In the abstract, the words themselves are inconclusive, equally capable of classification as words of assent or of reluctance.

---

[3] As the dissent notes, Ward's competency is not at issue in the appeal. *See post* at 24-25. The question of whether Ward possessed the *capacity* to understand the nature of his rights and participate in his defense is an altogether different question than whether Ward, in a given instance, *actually* intended to relinquish or abandon a known right or privilege, *see Johnson*, 304 U.S. at 464. Although the former implies that Ward was able to co-operate with his counsel in his defense, the latter requires the totality of the circumstances to demonstrate that he not only was able, but willing; that is, he must have clearly understood and concurred with his counsel's decision.

Yet, absent any evidence that the speaker had mental handicaps and a severe language-processing deficiency, we would accept a trial court's interpretation given that court's superior position to observe the speaker and infuse meaning into the statement. Here, however, where it was known that the defendant's ability to express himself through language was severely compromised, it was unreasonable to assign the statement meaning without the benefit of further inquiry. By quickly deciding "that's the best we'll ever do," the trial court concluded its inquiry prematurely and accepted what was an at-best ambiguous statement for a conclusive waiver.

We do not come to this conclusion only through an admittedly cold reading of that isolated proceeding's transcript. We note that later, when the trial court made an effort to explain his right in simpler terms, Ward expressed a modicum of understanding. Granted, given his aphasia, we are reluctant to attribute any more meaning to Ward answering "Yes" to the trial court's question, "Did you want to tell your story?" than anyone could reasonably inject into the facially ambiguous statement "I guess, I don't know." But we know that by this time Ward had understood that he didn't tell his story at trial—immediately after trial, he asked his attorney why he didn't have that chance. And faith in direct "Yes" answers aside, Ward jumped at the opportunity to tell his story to the judge in chambers, which indicated his continued desire to speak.

Nevertheless, instead of ensuring that Ward personally waived his right knowingly and intelligently, the Illinois appellate court—like the trial court before it—relied too heavily on Ward's counsel's strategic decision to preclude Ward from testifying. The appellate court noted that the decision to waive the right to testify "should be made with the advice of counsel," *Ward*, slip op. at 20 (citing *People v.*

*Smith*, 680 N.E.2d 291, 303 (Ill. 1997)), an observation that mirrored the focus of the trial court's initial inquiry, which was to secure Ward's adoption of his counsel's strategy. True, prudent defendants are often best served by listening to the advice of learned counsel. No matter how sound a counsel's advice may be, however, the decision to waive a fundamental right rests securely with the defendant. It simply cannot be trumped by a defense counsel's advice, even if that advice is honestly in the defendant's best interest.

And unwitting cooperation with counsel does not equate to a knowing, intelligent waiver. We agree that a court may correctly find wavier when "circumstances indicate that defendant acquiesced in the trial strategy employed by his counsel." *Id.* at 21 (quoting *People v. Raso*, 602 N.E.2d 53, 56 (Ill. 1992)). We understand the prudence of a rule that prevents criminal defendants from making unsubstantiated, self-serving, and im-plausible post hoc arguments that they were strong-armed by counsel into making the decision not to testify. *Underwood v. Clark*, 939 F.2d 473, 475 (7th Cir. 1991); *see also Manjarrez*, 258 F.3d at 624 (finding that defendant's repeated affirmative responses to the court's frequent inquiries, issued through an interpreter, regarding wheth-er the defendant understood and voluntarily waived his right to testify overcame his post hoc, unsubstantiated claim that he had not in fact understood his rights); *Lee v. Murphy*, 41 F.3d 311, 315 (7th Cir. 1994) (presump-tion against waiver overcome by "overwhelming evidence" that counsel conferred with the defendant and that the defendant acknowledged that by his own "free will" he concurred in the decision not to testify). Moreover, we continue to be aware of the "grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right . . . to testify in his own behalf without rendering the criminal process unworkable*." Underwood*, 939 F.3d at 475.

But far from making unsubstantiated, implausible, and merely self-serving claims in this case, Ward has shown that the totality of the circumstances evidences that he didn't knowingly acquiesce in his counsel's decision. Although a direct, unequivocal answer to a trial court's colloquy will suffice to find a knowing, intelligent waiver, *see, e.g.*, *Lee*, 41 F.3d at 315, none was given here. Ward's aphasia prevents a conclusive interpretation of the facially ambiguous statement, "I guess, I don't know," and all the other evidence in this case suggests that Ward did not personally, knowingly, and intelligently waive his right. Ward's counsel warned the court at the outset that he was making the decision to keep Ward off the stand and that he was skeptical of his client's ability to make a knowing, intelligent waiver. That skepticism was confirmed when Ward asked his counsel immediately after trial why he hadn't had the chance to tell his story. Furthermore, Ward continued to express this desire to tell his story during the hearing on his post-conviction motion, when he used that opportunity to tell it to the judge. We recognized in *Manjarrez* that there may be cases where the "defendant's conduct clearly indicates a fundamental lack of understanding regarding the meaning of the right to testify and/or the consequences of waiving it," and for all the reasons mentioned this is such a case. *Manjarrez*, 258 F.3d at 625. We therefore conclude that the Illinois appellate court's decision finding waiver under these circumstances was unreasonable error in light of governing Supreme Court precedent that requires personal, knowing, and intelligent waivers of fundamental rights.

Still, "[e]ven if the petitioner demonstrates constitutional error . . . he or she still may not be entitled to habeas relief where such error is deemed harmless; that is, could not have had a substantial and injurious effect or influence on the jury's verdict." *Harding v. Walls*, 300

F.3d 824, 828 (7th Cir. 2002) (citing *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). As the district court noted, "[n]ot all constitutional error fatally infects a trial." *Sternes*, 209 F. Supp. 2d at 960 (citing *Arizona v. Fulminante*, 499 U.S. 279, 307 (1991)). Instead, we undertake a harmless-error analysis to determine whether the verdict should be allowed to stand despite constitutional error. *See, e.g.*, *Ortega v. O'Leary*, 843 F.2d 258, 262 (7th Cir. 1988) (holding deprivation of the right to testify subject to harmless-error analysis).

Here, the district court found that the error was not harmless beyond a reasonable doubt, *see Chapman v. California*, 386 U.S. 18 (1967), nor could it say "with fair assurance, after pondering all that happened . . . , that the judgment was not substantially swayed by the error," *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). The state doesn't challenge this finding and, thus, has waived the argument that the error was harmless. In any event, we agree with both the district court and the Illinois appellate court that the question of Ward's sanity was "closely balanced," and that had it not been for the evidence of Ward's intoxication, the jury's verdict might have been set aside as against the manifest weight of the evidence. *Sternes*, 209 F. Supp. 2d at 961 (quoting *Ward*, slip op. at 13). Given this, we agree with the district court's conclusion that had the jury been given the opportunity to observe Ward testify while sober yet still exhibiting these signs of his mental deficiencies, it is conceivable that the jury would have given more credence to the expert psychiatric testimony and particularly Dr. Traugott's opinion that Ward's brain injury alone, regardless of his intoxication, would have rendered him incapable of conforming his actions to the law. On this close question, the inability to hear Ward testify was not harmless error.

**CONCLUSION**

The Illinois appellate court's affirmance of the trial court's determination that Ward waived his right to testify was unreasonable error in light of clearly established Supreme Court precedent requiring personal, knowing, and intelligent waivers of fundamental rights. The decision of the district court to grant the writ and vacate Ward's conviction is therefore AFFIRMED.

MANION, *Circuit Judge*, dissenting. This is undeniably a difficult case. James Ward clearly had mental deficiencies. Because he suffered from aphasia, a condition resulting from blunt head trauma, he had to be tested to determine if he was competent prior to his trial for the murder of his wife, Evelyn. At his fitness hearing on February 21, 1996, the parties stipulated to the contents of a DMHDD ("Department of Mental Health and Developmental Disabilities") report stating that Ward was fit to stand trial. The report concluded that:

> Defendant understands the reason for his charge and its seriousness and is ready and motivated to return to court. He has sufficient knowledge about the court system as it pertains to his case. He understands the role functions of the court officers and is now able to cooperate with counsel in his defense. We consider him psychologically fit to stand trial.

A finding of competency requires that a defendant may not possess a mental condition "such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to

assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Without a doubt, Ward falls at the low end of the spectrum of competency. His report cautioned that "one must exercise patience and listen closely to what [Ward] is saying, as a result of his severe handicaps due to his earlier brain injury."

The question now on appeal is whether Illinois state courts were reasonable in finding that during the trial Ward knew what he was doing and agreed to waive his right to testify. The Illinois trial court determined that when Ward responded "I guess, I don't know," during an in camera discussion, he was expressing his assent to his waiver of his right to testify.[1] On appeal the Illinois appellate court then deferred to this finding when deciding whether or not this statement justified a finding of a knowing and intelligent waiver.[2] The district court disagreed and granted Ward's petition for habeas corpus, holding that because Ward lacked a basic understanding of the right to testify, the Illinois Appellate Court erred in finding that his waiver of that right was knowing and intelligent. However, because the Illinois Appellate Court reasonably applied relevant federal law to the facts of this case, I respectfully dissent and would reverse the district court's grant of habeas corpus.

---

[1] At a post-trial proceeding, the trial court judge conducted a hearing as to whether Ward had executed a knowing and intelligent waiver. After hearing arguments, the trial court specifically concluded that Ward understood what his attorney was asking him and that he assented to the waiver.

[2] The Illinois Appellate Court found that the proper standard of review was whether the trial court's ruling was against the manifest weight of the evidence, citing the Illinois *Miranda* waiver cases, *People v. Bernasco*, 562 N.E.2d 958 (1990), and *People v. Scott*, 594 N.E.2d 217 (1992).

Under the AEDPA federal courts give deference to state courts with respect to claims that were adjudicated on the merits. 28 U.S.C. § 2254(d). To procure habeas relief under the AEDPA, a petitioner is required to show that state court determinations under review are either "contrary to" or employ an "unreasonable application of" federal law as determined by the United States Supreme Court. § 2254(d)(1). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).[3] The Supreme Court has explained that under the unreasonable application standard,

> a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly. *See Bell v. Cone*, 535 U.S. 685, 699 (2002); *Williams, supra*, at 411. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner.

*Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (*per curiam*). In determining whether or not the state court's application of the law to the facts of a case was objectively unreasonable, state court factual findings are pre-

---

[3] A petitioner may also attack a state court's adjudication on the grounds that it is based "on an unreasonable determination of the facts," § 2254(d)(2), but such attacks are accompanied by a rigorous burden of proof: state court factual findings are presumed to be correct unless the petitioner rebuts the presumption with "clear and convincing" evidence. § 2254(e)(1).

sumed to be correct. 28 U.S.C. § 2254(e)(1).[4] The court concedes that the Illinois Appellate Court followed the correct law, i.e., a waiver must be knowing and intelligent, but holds that it did so unreasonably because it relied too heavily on Ward's counsel's strategic decision of precluding Ward's testimony and improperly credited Ward's ambiguous statement, "I guess, I don't know," as a waiver of his right.

When a waiver is made in the presence of the court, such as the waiver was in this case, deference to the trial court's determinations, as mandated by AEDPA, is clearly important because the court has made credibility and state of mind determinations that it is in the best position to make. *See Lewis v. Fuchs*, 964 F.2d 670, 674-76 (7th Cir. 1992) (noting that a state trial court judge is in the best position to determine a criminal defendant's state of mind when executing a waiver of his constitutional rights after being questioned by the court). Deferential review of this type of fact intensive question is warranted when it appears that a trial court is "'better positioned' than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine." *Salve Regina College v. Russell*, 499 U.S. 225, 233 (1991).

As noted earlier, the report on Ward's competency to stand trial cautioned that "one must exercise patience and listen closely to what he was saying due to his severe

---

[4] Section 2254(e) (1)provides in pertinent part:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

handicaps." In this case the trial court exercised that patience, despite Ward's attorney's in-court waiver of his client's right to testify, and held an *in camera* session to verify Ward's decision. The specific issue of whether or not Ward possessed the mental faculty to express a waiver of his right to testify was determined at the outset by the trial court and is not at issue in Ward's habeas petition. The finding by the trial court of Ward's fitness to stand trial was never appealed in Illinois state court, nor was the issue raised in federal court. Even if it were at issue, competency determinations are definitively factual determinations which are presumed correct. *See Maggio v. Fulford*, 462 U.S. 111, 117 (1983); *Pierre v. Cowan,* 217 F.3d 939, 946 (7th Cir. 1992).

Therefore, the limited issue on appeal to the Illinois Appellate Court was not whether Ward was competent to stand trial, but whether his waiver to testify was knowing and intelligent.[5] The Illinois Appellate court reasonably deferred to the trial court's finding on this issue because a trial court judge's determination of whether Ward understood his rights and knowingly waived them is due deference pursuant to Supreme Court precedent. The trial court judge was required to parse Ward's statements and demeanor in order to determine his state of mind, which is the specific province of the trial court. *See Miller*, 474 U.S. at 113. The trial court was therefore in the best position to resolve Ward's often conflicting and vague statements, a resolution that should not be redetermined by a federal court on collateral review

---

[5] Voluntariness is not at issue in this case. The issue as framed by the court is whether or not "Ward lacked a basic understanding of the right to testify." *See Colorado v. Connelly*, 497 U.S. 157, 167 (1986) ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"; action under an insane delusion may be voluntary).

unless presented with clear and convincing evidence. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Neither the district court nor the members of this court had the opportunity to view Ward in person, nor hear his words when it examined the record of his conduct before the trial court. Only the trial court was in this position. Given the initial determination that Ward was competent to stand trial, it was reasonable for the Illinois Appellate Court to defer to the trial court's finding of a waiver to testify considering that the resolution of the issue depended "heavily on the trial court's appraisal of witness credibility and demeanor." *Thomas,* 516 U.S. at 111.

Because the state court's finding of waiver can be reasonably described as a determination of fact, it should have been "presumed to be correct" for purposes of a federal habeas corpus proceeding. *See* 28 U.S.C. § 2254(d). A habeas court may not disregard this presumption unless it expressly finds clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). The court concedes that it cannot overcome this standard as it notes that "Ward's aphasia prevents a conclusive interpretation of the facially ambiguous statement, "I guess, I don't know." *Supra* p. 19. Similarly, in light of the fact that Ward's statement of assent is inconclusive, we cannot hold that the Illinois Appellate Court applied Supreme Court precedent in an objectively unreasonable fashion. It is not our duty to displace the finding of a state court under habeas review due to a mere disagreement with the result. Instead our province is restricted to finding "whether the determination is at least minimally consistent with the facts and circumstances of the case." *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997). In this case, the state court's finding achieves that result.

I would, therefore, reverse and remand to the district court with instructions to deny the petition for habeas corpus, and I respectfully dissent.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—7-8-03