In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1792

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BRUCE JONES,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cr-00072-TWP-DML-1 — **Tanya Walton Pratt**, *Judge.*

ARGUED SEPTEMBER 8, 2016 — DECIDED DECEMBER 21, 2016

Before WOOD, *Chief Judge*, and KANNE and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal in a criminal case presents an unusual combination of offenses: health care fraud and unlawful possession of firearms and ammunition. Defendant Bruce Jones was both a family counselor and a firearms enthusiast who collected dozens of guns and thousands of rounds of ammunition. Jones had a prior felony conviction,

so it was a federal crime for him to possess firearms and ammunition. The FBI discovered these weapons while investigating Jones for allegedly fraudulent health care billing. A federal grand jury charged Jones with three counts of possessing firearms and ammunition in violation of 18 U.S.C. § 922(g)(1) and one count of health care fraud in violation of 18 U.S.C. § 1347. The district court bifurcated the case for separate trials on the firearms charges and the health care fraud charge. The juries convicted Jones on all counts. The district court sentenced Jones to 90 months in prison on his fraud conviction and 100 months on each felon-in-possession conviction, with all terms to be served concurrently.

Jones appeals and raises four distinct issues. First, he contends that the *ex parte* pretrial restraint of certain life insurance policies violated his Fifth and Sixth Amendment rights. Second, he argues that the district court erroneously denied his request for new counsel during his fraud trial. Third, he contends that he was denied the opportunity to testify at his fraud trial. Fourth, he challenges the court's sentencing guideline computation. We affirm in all respects.

I.   *Pretrial Restraint of Assets*

Jones first challenges the pretrial restraint of six life insurance policies titled in his name. The government listed these policies in a forfeiture allegation in the controlling, second superseding indictment. On April 15, 2014, following Jones's conviction on the felon-in-possession charges but before his fraud trial, the government filed an *ex parte* application under 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(e)(1)(A) to restrain those policies in anticipation of post-conviction forfeiture. The district court entered a restraining order that same day. Jones contends that the pretrial restraint violated his Sixth

Amendment right to hire counsel of choice and his Fifth Amendment right to due process of law.

Ordinarily, we review *de novo* questions of constitutional law. See *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006). But there is a wrinkle here: Jones did not object at the time that his life insurance policies were restrained. Nor did he raise an objection at any point during the district court proceedings even though the restraining order invited him to "petition for a pre-trial hearing if he can demonstrate that he has no other assets available with which to retain counsel" or if he could show that the restrained policies were "not subject to forfeiture." Where a defendant fails to lodge a timely objection before the district court, we review only for plain error, assuming the defendant has not actually waived the point. See *United States v. Bickart*, 825 F.3d 832, 837 (7th Cir. 2016) ("To demonstrate plain error, defendants must show: (1) an error or defect, (2) that is clear or obvious, (3) affecting the defendants' substantial rights. Even then, we have discretion to correct the error if it seriously impugns the fairness, integrity, or public reputation of the judicial proceedings, but we need not do so.") (citations omitted).

To excuse his failure to raise this issue in the district court, Jones argues that the legal landscape shifted while his appeal was pending, creating an analytical path that was not available to him in 2014. Specifically, Jones points to *Luis v. United States*, 578 U.S. —, 136 S. Ct. 1083 (2016). In *Luis*, the Supreme Court held that the "pretrial restraint of *legitimate, untainted assets* needed to retain counsel of choice violates the Sixth Amendment." *Id.* at 1088 (plurality opinion) (emphasis added); see also *id.* at 1096 (Thomas, J., concurring in the judg-

ment) (agreeing with plurality that a "pretrial freeze of un-
tainted assets violates a criminal defendant's Sixth Amend-
ment right to counsel of choice"). In so holding, the plurality
distinguished two earlier cases in which the Court had found
no Sixth Amendment defect in forfeiture proceedings. *Id.* at
1090–91 (plurality opinion). Compare *Caplin & Drysdale, Chtd.
v. United States*, 491 U.S. 617 (1989) (post-conviction forfeiture
that deprived defendant of funds he would have used to pay
attorney did not violate Sixth Amendment because, pursuant
to statute, title to funds vested in United States upon defend-
ant's commission of crime), with *United States v. Monsanto*, 491
U.S. 600 (1989) (pretrial restraint that deprived defendant of
tainted assets traceable to crime likewise did not violate Sixth
Amendment).

In *Luis*, unlike *Caplin & Drysdale* and *Monsanto*, the re-
straining order prevented the defendant from using her own
*un*tainted funds to hire counsel. *Luis*, 136 S. Ct. at 1090 (plu-
rality opinion). The government's interest in Luis's untainted
funds was similar to that of an unsecured creditor, who
"someday might collect from a debtor's general assets" but
"cannot be said to have any present claim to, or interest in, the
debtor's property." *Id.* at 1092. Citing *Luis*, Jones argues that
the government now bears the burden to demonstrate at the
outset that the assets it wants to restrain are tainted.

Jones may read *Luis* too expansively. *Luis* says nothing
about timing or burden shifting. On the contrary, the govern-
ment in that case conceded that the district court had re-
strained untainted funds. *Id.* at 1088. But even assuming with-
out deciding that Jones's interpretation of *Luis* is correct, that
case would have offered Jones at best an additional line of at-

tack on the district court's restraining order. Under long-settled circuit law, the pretrial restraint of a defendant's assets "without affording the defendant an immediate, postrestraint, adversary hearing at which the government is required to prove the likelihood that the restrained assets are subject to forfeiture violates the due process clause to the extent that it actually impinges on the defendant's qualified sixth amendment right to counsel of choice." *United States v. Moya-Gomez*, 860 F.2d 706, 731 (7th Cir. 1988).[1] If the district court finds that the defendant has insufficient alternative assets with which to pay counsel, but the government fails to justify its retention of all the frozen assets, "then the court must order the release of funds in an amount necessary to pay reasonable attorneys' fees for counsel of sufficient skill and experience to handle the particular case." *Id.* at 730.

Assuming that Jones's life insurance policies were *not* tainted by his fraud, and assuming further that he genuinely needed those assets to retain counsel, we cannot understand why he failed to invoke his right to an immediate hearing under *Moya-Gomez*. Conversely, if the life insurance policies *were* tainted, or if Jones had sufficient alternative assets available

---

[1] Jones argues that a post-restraint hearing is insufficient and that he should have been afforded a hearing prior to the restraint on his property. We have twice declined to decide whether a pre-deprivation hearing is necessary in this context, see *United States v. Phillips*, 434 F.3d 913, 916 (7th Cir. 2005) (per curiam); *United States v. Kirschenbaum*, 156 F.3d 784, 793 (7th Cir. 1998), and the Supreme Court has likewise declined to decide the question, see *Monsanto*, 491 U.S. at 615 n.10. We again decline to consider the question here. As explained below, Jones has not shown a bona fide need for the restrained assets. Thus, as in *Phillips*, this case presents an "inadequate vehicle by which to consider the issue," 434 F.3d at 916.

to him, then *Luis* would not have strengthened his litigating position. Either way, we find no plain error.

In addition to a due process argument under *Moya-Gomez*, Jones could have presented a statutory argument based on the language of 21 U.S.C. § 853(e). The overwhelming majority of courts to consider the question have held that § 853(e) "conveys Congress's intent to authorize the restraint of *tainted* assets prior to trial, but *not* the restraint of *substitute* assets." *United States v. Parrett*, 530 F.3d 422, 431 (6th Cir. 2008); see also, e.g., *United States v. Jarvis*, 499 F.3d 1196, 1204 (10th Cir. 2007) ("[A]ll but one federal court of appeals to address the issue has determined the legislative silence regarding substitute property in § 853(e) precludes pre-conviction restraint of substitute property.").

Jones points out that the government's *ex parte* motion asserted there was probable cause to believe that his life insurance premiums and contributions "constitute or derived from proceeds obtained from the health care fraud, *or represent a substitute asset*, and are therefore subject to forfeiture." Jones also notes that the government cited *In re Billman*, 915 F.2d 916, 921 (4th Cir. 1990), which held that a similar forfeiture statute, 18 U.S.C. § 1963, authorizes pretrial restraint of substitute assets. But we have never held as much. No controlling precedent barred Jones from asking the district court to construe § 853(e) as applying only to tainted assets, an argument that at least one district court in this circuit has accepted. See *United States v. Toran*, No. 13-30072, 2015 WL 1968698, at *7 (C.D. Ill. May 1, 2015).

Thus, Jones could have advanced a constitutional argument, a statutory argument, or both in response to the re-

straining order. Any one of these approaches could have delivered the same relief he believes he might have obtained under *Luis*. Jones forfeited his challenge to the restraining order by failing to object in the district court, so we review that order only for plain error.

We find no plain error. Nothing in the record tends to show that the life insurance policies were not tainted by Jones's fraud. Further, it is unclear whether Jones even needed the life insurance policies to retain counsel.[2] A presentence investigation report prepared in December 2013 estimated Jones's net worth (exclusive of the insurance policies) at over half a million dollars. Granted, most of that net worth was attributable to real estate, and the government apparently filed notices of *lis pendens* against some of Jones's properties. But a *lis pendens* notice does not deprive real estate of all marketable value; it simply places successors in interest on notice of a potential competing claim. Further, it appears that at least two of the *lis pendens* notices were lifted in August 2014, well in advance of Jones's fraud trial.

In any event, because Jones never objected to the restraint on his life insurance policies, the district court had no reason to probe these matters in an evidentiary hearing. The district court committed no plain error by entering the pretrial restraining order, which invited Jones to challenge it promptly if he thought there were grounds to do so. Having failed to do so, Jones is not entitled to relief based on his first argument.

---

[2] It is also unclear whether Jones could have simply liquidated those policies at will.

II. *Request for Substitute Counsel*

Jones next argues that the district court improperly denied his request for new counsel during his fraud trial, which was the second of the two. He had an opportunity to explain his reasons for requesting substitute counsel, so we review the district court's denial for abuse of discretion. *United States v. Harris*, 394 F.3d 543, 551 (7th Cir. 2005). We consider such factors as the timeliness of the defendant's motion, the adequacy of the district court's inquiry into the motion, and whether the conflict resulted in a total lack of communication preventing an adequate defense. *Id.* at 552. No single factor is dispositive. If we find an abuse of discretion, we may nevertheless uphold the district court's decision "unless the defendant establishes that he was deprived of his Sixth Amendment right to effective assistance of counsel." *United States v. Bjorkman*, 270 F.3d 482, 500 (7th Cir. 2001).

The record shows that Jones had a rocky relationship with his appointed attorney, Mark Inman, who is an experienced criminal defense lawyer in federal cases. Despite that rocky relationship, we conclude that the district judge did not abuse her discretion in denying Jones's request for substitute counsel. We do not reach the separate question whether Jones's Sixth Amendment right was compromised.

Turning to the three factors identified in *Harris*, we consider first the timeliness of Jones's request. Jones asked for a new lawyer three weeks before his fraud trial was scheduled to begin. Three weeks is not much time to prepare for such a trial. We assume that if the district court had appointed a new lawyer an immediate request for a continuance would have been expected. Even so, we have previously recognized that requests for new counsel submitted several weeks before a

critical proceeding may be timely under the circumstances. Compare *United States v. Zillges*, 978 F.2d 369, 372 (7th Cir. 1992) (request made one month before trial did not "represent[] a tactic to secure a continuance on the eve of trial"), and *United States v. Ryals*, 512 F.3d 416, 419 (7th Cir. 2008) (request three weeks before sentencing hearing was timely, particularly where breakdown in communication between attorney and client did not occur until after trial), with *United States v. Hall*, 35 F.3d 310, 313–14 (7th Cir. 1994) (request after defendant pled guilty and just ten days before sentencing hearing appeared to be an "effort to derail the sentencing that was fast approaching"), and *United States v. Burgos*, 539 F.3d 641, 646 (7th Cir. 2008) (request on morning of trial came too late).

The second factor—adequacy of the inquiry—weighs in the government's favor. After receiving Jones's letter, the district judge referred the matter to a magistrate judge for a hearing. During that hearing, the magistrate judge gave Jones an opportunity to explain his concerns. The magistrate judge also heard from attorney Inman and from the government. In denying Jones's request, the magistrate judge explained that Jones's dispute with his lawyer primarily concerned trial strategy and that such disputes are insufficient grounds for replacement of appointed counsel. Jones renewed his request a week later. The district judge held an *ex parte* session in which Jones explained his complaints about Inman. At the end of the session, the judge denied Jones's renewed request. After the fraud trial but before sentencing, Jones asked once more for a new lawyer. The district judge delegated the request to a different magistrate judge who heard from both Jones and Inman in a January 2015 hearing. The magistrate

judge denied Jones's third request, noting that he found In-
man's representations "entirely credible" and that Jones failed
to demonstrate either deficient representation or prejudice.

While Jones may disagree with the judges' conclusions, he
had ample opportunity to present his concerns to the district
court. In this respect, Jones's case is unlike cases where we
have found insufficient inquiries into requests for substitute
counsel. See, e.g., *Ryals*, 512 F.3d at 419–20 (inquiry insuffi-
cient where judge asked attorney just two questions and at-
torney said unequivocally that he could not represent defend-
ant adequately at sentencing); *Zillges*, 978 F.2d at 371–72 (in-
quiry insufficient where judge ignored defendant's letter until
morning of trial and then failed to ascertain why defendant
was unhappy with attorney); *United States v. Morrison*, 946
F.2d 484, 498–99 (7th Cir. 1991) (inquiry insufficient where
judge denied defendant's motion without holding a hearing).
Here, the district judge and the two magistrate judges "lis-
tened to [defendant's] concerns, and responded thoughtfully
and appropriately." *Bjorkman*, 270 F.3d at 501. The inquiry was
adequate here.

The third factor, the nature of the conflict between attor-
ney and client, gives us pause. Jones points to two defects in
his relationship with Inman: (1) a breakdown in their commu-
nication, and (2) a series of incidents in which Inman por-
trayed Jones in a negative light to the court.

As to the communication breakdown, Jones identifies let-
ters that he sent Inman during the months leading up to trial.
These letters show that Jones was not satisfied with the atten-
tion he was receiving. On September 24, for instance, Jones
complained that Inman had visited him just four times during
a six-month period, while on October 9, he wrote that Inman's

"ten minute visit" that day was not what Inman had promised. We hesitate to place too much importance on Jones's letters, which show that Jones harbored unrealistic expectations about his attorney's obligations. For example, in the September 24 letter, Jones directed Inman to answer "immediately" twenty-seven written questions. He made similar demands on October 3 and again on October 9. Jones also referred to a fourteen-page letter that apparently contained directions for Inman to follow. While an attorney "undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy," *Florida v. Nixon*, 543 U.S. 175, 187 (2004) (citation omitted), the attorney also has the "full authority to manage the conduct of the trial" and need not consult with the client on "every tactical decision," *Taylor v. Illinois*, 484 U.S. 400, 418 (1988). It is difficult on the face of this record to determine whether the conflict between Inman and Jones at that point involved a true breakdown in communication or simply a mismatch of expectations.

By the time of trial, however, the relationship between the two had grown quite strained. Inman made a series of remarks to the court that reflected his frustration with his client. At a hearing on October 20, Jones complained to the court that Inman had "never gone over the defense" with him. Inman disagreed, telling the judge that Jones's statement was "just not true" and adding that Jones was "incapable of telling the truth." On October 27, Jones told the court that Inman had said he would face a consecutive sentence if he testified. Inman again disagreed, saying that Jones "can't tell … the truth." At a hearing during the sentencing phase, Inman recounted Jones's conduct during his first trial, saying that Jones had "faked a heart attack" and "concocted a defense." Such

statements, accurate though they were, obviously cast doubt on the viability of the attorney-client relationship.

These matters are left to the sound discretion of the district judge, however, because she was much closer to the friction between client and attorney and to its larger context in the case. Despite the obvious tension between Inman and Jones, we find no abuse of discretion here. The record shows that Jones had engaged in a prolonged pattern of obstructionist behavior. Against that backdrop, the district judge could reasonably have inferred that Jones's request for a new lawyer was yet another attempt to delay justice. In fact, prior to Inman's appointment as his lawyer, Jones had cycled through three other attorneys or legal teams during just the adversarial stage of the proceedings. He had also requested multiple delays for the first trial, on the firearms charges. Then, on the morning trial was set to begin, Jones failed to appear. He had taken a cocktail of medications that caused him to lose consciousness. The scheduled trial had to be delayed again.

At Jones's first sentencing hearing, in imposing a two-level enhancement for obstruction, the district judge said that Jones, a certified addiction specialist, was "very much familiar with the effects of the cocktail of medications that he consumed: sleeping pills, muscle relaxer, and benzodiazepine. And even a lay person would know that taking that combination would make you incapacitated the morning of your jury trial." Later, in denying Jones's request for a new lawyer, the district judge linked her decision to Jones's long pattern of obstructionist behavior:

> The Court has considered the timeliness of Defendant's eleventh hour request to change CJA counsel, the extent of any conflict or breakdown

> in communication between lawyer and client[]
> (including the client's responsibility for any con-
> flict), the number of attorneys who have been
> assigned to this Defendant, and the pattern of
> engaging in intentional delay and manipulation
> by the Defendant. The Court finds that the in-
> terest of justice does not dictate a substitution of
> counsel … .

Given the history of the case, including Jones's pattern of de-
lay and obstruction, the district judge did not abuse her dis-
cretion in denying Jones's request for appointment of yet an-
other lawyer.

III. *Waiver of the Right to Testify*

Moving on to the fraud trial itself, Jones argues that the
district court deprived him of his right to testify on his own
behalf. Whether a defendant's right to testify has been in-
fringed is a mixed question of law and fact that we review *de
novo*, though we review the district court's underlying factual
findings for clear error. *United States v. Stark*, 507 F.3d 512, 516
(7th Cir. 2007).

A few constitutional rights of the accused are so funda-
mental that they are deemed personal to the accused, and "he
alone may decide whether these rights will be exercised or
waived." *United States v. Curtis*, 742 F.2d 1070, 1076 (7th Cir.
1984). These rights include the decisions whether to plead
guilty or proceed to trial; whether to be tried by judge or jury;
whether to appeal an adverse verdict; whether to forgo the
assistance of counsel; and, as relevant here, whether to testify.
*Id.*

Jones says that he never clearly and unequivocally waived his right to testify. He adds that he "repeatedly affirmed to the district court that he wanted to testify" but that attorney Inman "refused to let him testify, preventing him from exercising this constitutionally guaranteed right." Based on our review of the record, we disagree. The district judge correctly found that Jones waived his right to testify. The judge engaged in three colloquies with Jones on the subject. While Jones's responses during the first two colloquies were ambiguous, his third response was an unequivocal waiver.

On the second day of trial, shortly after the government rested, the judge asked defense attorney Inman whether he planned to present any evidence. Inman said no. The judge then asked Jones whether he wished to testify. Jones's answer was ambiguous: he said that Inman would not ask him any of the questions that he had prepared, "so it would do no good." Inman said that he was "well within [his] ethical and professional obligations in making this call," but the district judge stated that it was still up to Jones whether he wished to testify. Even in a situation where a criminal defense lawyer suspects that his client might testify untruthfully, the lawyer cannot simply bar his client from testifying on his own behalf.[3]

The judge next conducted an *ex parte* colloquy during which Jones's response was again ambiguous:

---

[3] The conflict between a criminal defense attorney and an accused who the attorney knows intends to testify falsely poses one of the oldest and most intractable problems in professional ethics. Indiana Rule of Professional Conduct 3.3, which applies in the Southern District of Indiana, addresses the problem. The comment to the rule suggests some solutions, including allowing the client to testify in narrative form, but does not provide guidance that is clear in all scenarios.

> THE COURT: Mr. Inman … can't ask you any questions that would elicit what he believes would be perjurious testimony.
>
> THE DEFENDANT: I wouldn't—I wouldn't expect him to, but I see that he's not going to do it, so I have no choice but to stand down.
>
> THE COURT: And take your attorney's advice, which is fine, okay? I just need to feel confident that—
>
> INMAN: Your Honor, I think with that, we're prepared to go forward.
>
> THE COURT: Okay. Okay.
>
> THE DEFENDANT: But I wasn't lying, nor would I lie. Thank you, Your Honor.

This ambiguous exchange did not resolve the matter. Later that afternoon, the district judge inquired again and got another ambiguous answer:

> THE COURT: Now, your lawyer has strongly stated that he does not believe it would be to your benefit, tactically and strategically, to testify, but you've got to tell me that you agree with that.
>
> THE DEFENDANT: But, Your Honor, the issue I have is, I can't testify if I—we haven't gone over any questions. I mean, there's a lot of things that could be—
>
> THE COURT: Well, you don't necessarily have to go over any questions. Your lawyer … knows what questions to ask.

….

THE DEFENDANT: Your Honor, I bow to your—I mean, you're the boss. I respect you and I respect your position.

THE COURT: All right.

THE DEFENDANT: Thank you, ma'am.

THE COURT: And I respect your position, also, okay? So you're going to concede to the advice of your counsel and not testify. …

INMAN: Thank you, Your Honor.

Those first two colloquies were not sufficient to show that Jones himself was personally waiving his right to testify. If the judge had not tried a third time, Jones's argument on appeal would have considerably greater force. But the judge wisely inquired again on the final morning of trial:

THE COURT: First of all, Mr. Inman … the Court needs to be comfortable that your client is comfortable with his waiver of his right to testify. And you've talked with him about that?

INMAN: We have, Your Honor. We've talked this morning.

THE COURT: And, Dr. Jones, are you comfortable with your decision?

THE DEFENDANT: Yes.

Against the background of the two earlier discussions, Jones's unqualified "yes" answer during the third colloquy was an unequivocal waiver of his right to testify. It is helpful to contrast those rare cases in which we have found invalid waivers.

For example, in *Ward v. Sternes*, 334 F.3d 696, 700 (7th Cir. 2003), the defendant answered the court's question whether he agreed that it was a good decision not to testify by stating: "I guess. I don't know." That ambiguous response was all the less reliable because the defendant suffered from aphasia, a condition that manifested in a disconnect between questions asked and answers received. *Id.* at 698. And in *Ortega v. O'Leary*, 843 F.2d 258, 260 (7th Cir. 1988), the defendant twice interrupted the proceedings and expressed his desire to testify. The trial judge ordered the defendant to remain silent. On further inquiry, defense counsel stated that a "joint decision had been made" that the defendant would not testify. *Id.* The defendant protested, but the court treated the evidence as closed and allowed the case to proceed to closing arguments.

This case is readily distinguishable from *Ward* and *Ortega*. Unlike *Ward*, there is no evidence in this record tending to show that Jones suffered from any physical or mental impairment that might have compromised his waiver. Unlike *Ortega*, the district judge here made clear that the decision whether to testify was ultimately up to Jones, and she asked three times to ensure that his waiver was knowing and voluntary. And unlike both *Ward* and *Ortega*, Jones's answer during the final colloquy—a simple "yes"—was clear. See *Ward*, 334 F.3d at 707 ("direct, unequivocal answer to a trial court's colloquy will suffice to find a knowing, intelligent waiver"). Given the choice, Jones elected not to testify at his fraud trial. Apprised of his constitutional right, he waived it.

IV. *Sentencing Guidelines Calculation*

Finally, Jones contends that the district court miscalculated the sentencing guideline range for his firearms offenses by improperly taking account of his 1985 felony conviction for

a controlled substance offense. We review *de novo* the district court's legal interpretations of the Sentencing Guidelines, though we review its factual findings for clear error. *United States v. Saunders*, 826 F.3d 363, 372 (7th Cir. 2016).

In applying the Guidelines for Jones's fraud conviction, the district judge computed a base offense level of six with a ten-level enhancement for the loss amount and a two-level enhancement for abuse of trust, resulting in an adjusted offense level of 18. In applying the Guidelines for Jones's felon-in-possession convictions, although the base offense level would ordinarily be 14, the district judge used a base offense level of 20 under U.S.S.G. § 2K2.1(a)(4)(A). That section provides for an enhancement where the "defendant committed any part of the instant offense subsequent to sustaining one felony conviction of either a crime of violence or a controlled substance offense." The judge added six levels for the number of firearms involved in the offense and two levels for obstruction of justice, resulting in an adjusted offense level of 28. The judge used this second adjusted offense level as the combined adjusted offense level for both offense groups. With three criminal history points, Jones was in criminal history category II, which resulted in a guideline range of 87 to 108 months in prison. The judge ultimately sentenced Jones to 90 months on the fraud count and 100 months on each felon-in-possession count, all terms to be served concurrently.

Jones argues that the district judge should have disregarded his 1985 conviction. Under U.S.S.G. § 2K2.1 cmt. n.10 and §§ 4A1.1 and 4A1.2, there is a fifteen-year lookback period for prior felony convictions. See § 4A1.2(e)(1) ("Any prior sentence of imprisonment exceeding one year and one month

that was imposed within fifteen years of the defendant's commencement of the instant offense is counted. Also count any prior sentence of imprisonment exceeding one year and one month, whenever imposed, that resulted in the defendant being incarcerated during any part of such fifteen-year period."). Because Jones was released from state custody in October 1988, the "instant offense" must have commenced no later than October 2003 to bring the prior conviction within its scope. Yet the controlling indictment charged that Jones possessed firearms and ammunition between March and June 2010, over 21 years after he was released from state custody.[4]

While the indictment charged only conduct occurring in 2010, the evidence introduced at trial showed that Jones possessed weapons and ammunition much earlier. For instance, the government introduced a 1996 prenuptial agreement signed by Jones and Larissa Coroban, his then-fiancée. The document described Jones's assets as including fifteen pistols, nine shotguns, and fourteen rifles. The government also introduced a document drafted by Jones in 2001 titled "Transfer, Receipt, and Agreement of Firearms." Through this document, Jones purported to transfer to Ms. Coroban certain weapons that a friend had been holding on his behalf. Jones implied that he had owned these weapons since before his 1985 conviction; he said that he was advised to "write this up

---

[4] Although the parties disagree about exactly which guideline range would have applied if the district judge had excluded the 1985 conviction from her computation, any range would have been significantly lower than the one used. With a base offense level of 14 instead of 20 and criminal history category I—assuming the same enhancements for firearm quantity and obstruction of justice—Jones's guideline range for his firearms offenses would have been 41 to 51 months in prison, less than half the range that the district judge used.

so no one would make trouble over [his] owning them." He
also asked Ms. Coroban not to sell three of the guns until after
his death, a detail that the district judge later highlighted as
evidence of possession.

Additional evidence supports an inference that Jones con-
tinuously possessed firearms from at least 1996 (and likely
much earlier) up through and including the charged period.
For example, the government introduced a "Financial Balance
Sheet" that Jones apparently drafted in April 2009. It valued
Jones's "Gun Collection/Ammo" at that time at $35,000. The
government also introduced a 2009 e-mail in which Jones told
his brother about his large gun collection. During the FBI in-
vestigation in 2010, agents recovered dozens of weapons and
thousands of rounds of ammunition from Jones's residence,
his treatment lodge, and his cabin in Roundup, Montana. The
evidence seized at the Montana cabin was especially inculpa-
tory, as Ms. Coroban testified that she had never visited the
cabin. Two of the guns recovered from the cabin were listed
on an inventory sheet that investigators also seized: that sheet
listed appraisal values dating to 1983. A Colt .45 caliber "Gold
Cup" pistol recovered from Jones's treatment lodge in Indiana
matched the description of a gun Jones testified that he car-
ried in the 1970s.

In light of all this evidence, the district judge found an "on-
going series of weapon possession by a prohibited person."
She added that Jones's "possession and acquirement of his
massive gun collection … took place over decades." These
findings are not clearly erroneous. Jones continuously pos-
sessed weapons beginning no later than 1996 and probably
much earlier. Thus, while the indictment charged unlawful
possession in 2010, the continuous course of conduct giving

rise to the charges began within the fifteen-year period fol-
lowing Jones's release from state custody. Under the terms of
U.S.S.G. §§ 2K2.1(a)(4)(A) and 4A1.2(e)(1), the district court
properly used Jones's 1985 conviction to enhance his base of-
fense level on the felon-in-possession counts.

Alternatively, Jones's possession of firearms outside the in-
dictment window could be characterized as relevant conduct
for guideline purposes. Application note 8 to § 4A1.2 teaches
that the "commencement of the instant offense" for purposes
of calculating the fifteen-year lookback period includes rele-
vant conduct as defined in § 1B1.3. That section in turn defines
relevant conduct to include acts or omissions that were "part
of the same course of conduct or common scheme or plan as
the offense of conviction." § 1B1.3(a)(2). "Offenses are part of
the same course of conduct if they are 'part of a single episode,
spree, or ongoing series of offenses.'" *United States v. Ortiz*,
431 F.3d 1035, 1040 (7th Cir. 2005) (citation omitted). We con-
sider whether there is a "strong relationship between the un-
charged conduct and the convicted offense, focusing on
whether the government has demonstrated a significant 'sim-
ilarity, regularity, and temporal proximity [between] the un-
charged acts and the offense of conviction.'" *United States v.
Acosta*, 85 F.3d 275, 281 (7th Cir. 1996) (alteration in original)
(citation omitted).

The similarity factor is plainly satisfied in this case. The
uncharged conduct (possession of firearms by a prohibited
person) was identical to the charged conduct. Given the dis-
trict court's reasonable finding that Jones possessed firearms
continuously from at least 1996 forward, the regularity and
proximity factors are satisfied as well.

Jones argues that his prior possession of weapons cannot constitute relevant conduct under the Sentencing Guidelines because of the bar on double-counting. See U.S.S.G. § 1B1.3 cmt. background ("Conduct that is not formally charged or is *not an element of the offense of conviction* may enter into the determination of the applicable guideline sentencing range.") (emphasis added). This argument is a non-starter. Section § 922(g)(1) simply prohibits felons from possessing firearms and ammunition, period; duration is not an element of the offense. But at the sentencing stage, it is appropriate for the sentencing judge to consider the length of time over which the defendant violated the prohibition. Other things being equal, a felon who possesses a weapon for a fleeting moment is less culpable than one who possesses many weapons continuously for many years.

Jones also argues that uncharged conduct must be "separate and/or iterative" to qualify as relevant conduct under U.S.S.G. § 1B1.3. In support of his argument, Jones cites several cases addressing episodic or transactional crimes. See *United States v. Sumner*, 325 F.3d 884 (7th Cir. 2003) (drug dealing); *United States v. Spry*, 190 F.3d 829 (7th Cir. 1999) (drug dealing); *United States v. Powell*, 124 F.3d 655 (5th Cir. 1997) (tax evasion). These episodic crimes by their very nature involve separate (if similar) episodes. But 18 U.S.C. § 922(g)(1) defines a status-based crime—passive conduct that by its nature is often continuous, not episodic or iterative. Nothing in § 1B1.3 leads us to believe that the Sentencing Commission intended to exclude status-based offenses from the relevant conduct provisions. On the contrary, by taking into consideration the length of time that a defendant possesses weapons in violation of federal law, a sentencing judge furthers the goal of the relevant conduct Guideline—i.e., "taking into account

all germane uncharged conduct demonstrating the seriousness of the offense conduct." *United States v. Nance*, 611 F.3d 409, 417 (7th Cir. 2010).

In the end, whether viewed as relevant conduct or simply as a part of the offense conduct, Jones's continuous possession of firearms starting in 1996 or earlier brings his 1985 conviction within the fifteen-year lookback period. The district court properly used that conviction to increase the base offense level for Jones's felon-in-possession counts. We find no error in the resulting guideline computation.

Jones's convictions and sentences are AFFIRMED.