Filed 3/21/22  P. v. Brevik CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| THE PEOPLE, | C084931 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F6468 ) |
| v. | |
| DONOVAN CHAD BREVIK, | |
| Defendant and Appellant. | |

Charged with numerous counts of domestic violence, child molestation, dissuading a witness, and violating a no contact order, defendant Donovan Chad Brevik had a difficult trial.  Based on his inability to assist counsel, defendant was found incompetent to stand trial early in the proceedings.  When the trial resumed after competency was restored, defendant briefly sought, then withdrew, a request to represent

1

himself. During the course of the proceedings, defendant filed several *Marsden*[1] motions, had one appointed counsel successfully request to be relieved, and engaged in numerous disruptive outbursts.

A jury found defendant guilty of three counts of spousal abuse (Pen. Code, § 273.5, subd. (a)),[2] nine counts of dissuading a witness (§ 136.1, subd. (a)(2), two counts of dissuading a witness (§ 136.1, subd. (b) (1)), two counts of child abuse (§§ 273a, subd. (a), 273d, subd. (a)), two counts of oral copulation with a child under the age of 10 (§ 288.7, subd. (b)), a single count of lewd and lascivious acts with a child under the age of 14 (§ 288, subd. (a)), and 32 counts of violating a restraining order (§ 166, subd. (c)(1)) along with an enhancement for personally inflicting great bodily injury (§ 12022.7, subd. (e)). The jury found defendant sane for all counts, and the trial court sentenced him to 36 years eight months plus 30 years to life.

Defendant contends on appeal that: (1) the trial court's refusal to grant a continuance denied his right to self-representation; (2) the court erred in failing to hold a competency hearing after trial resumed; (3) remarks during the prosecutor's closing argument violated his right to remain silent; (4) the waiver of his right to testify was invalid; (5) there is insufficient evidence to support the convictions for violating a restraining order; (6) trial counsel was ineffective; (7) cumulative error warrants reversal; and (8) the matter should be remanded for the trial court to consider granting section 1001.36 mental health diversion.

Defendant had a month before trial when he asserted the right to represent himself. It was within the trial court's discretion to deny the continuance when defendant did not specify how long he wanted the trial continued, did not explain why he needed the extra

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

[2] Undesignated statutory references are to the Penal Code.

2

time, and defendant already had significant time to prepare for trial. While there is some evidence defendant voluntarily refused to take his medication for a brief time after competence was restored, there is no evidence that defendant was not provided the proper medication, and the record does not support our declining to defer to the implicit findings of the trial court and defense counsel that defendant was competent to be tried. While the prosecutor erred in referring to defendant's failure to testify, prejudice was averted by the trial court's subsequent admonition. Finding the remaining contentions are lacking, we shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Guilt Phase*

Erika married defendant in 2009. They have two daughters, L.B. (born 2009) and D.B. (born 2013).[3] The couple had problems due to mutual infidelity and poor communication. When they lived in Arizona, defendant threatened her with loaded firearms several times and was physically violent to her as well. He would slap Erika, punch her in the face, or choke her into unconsciousness.

They moved from Arizona to California in 2014. The family first lived with their friends Nick Movine and Leeco Thach in Sonora, then moved to a trailer park in Angel's Camp after living with their friends soured. Erika worked while defendant stayed home with the children. The abuse continued after they moved to the trailer; on several occasions, defendant, who kept questioning her fidelity, would choke Erika. Another time, he held a knife to her neck.

On August 7 or 8, 2014, defendant choked Erika after he got upset about something. He next pinned Erika down and repeatedly punched her in the face. Her eye was swollen shut on the following day. Defendant, who blamed Erika for the domestic

---

[3] Erika testified under an immunity agreement.

3

violence, would not let her leave the trailer. She missed nearly a month of work as a result of the attack and had to tell her employer she had been in a car accident.

The abuse resumed a few weeks later. Defendant grabbed Erika by the neck and would not let her leave the trailer. Once again, defendant pinned her down and repeatedly punched her in the face. Defendant's attack knocked out Erika's front teeth. He blamed Erika for this attack as well.

According to Erika, defendant physically abused L.B. "too many" times to count. The abuse often took place when Erika was at work; she would return home to find L.B. with a cut face or a busted lip. Defendant once punched L.B. in the stomach and several times he pulled her hair and jerked her head towards him. He choked L.B. on several occasions. Defendant told L.B. to blame her injuries on a little boy at the playground. L.B. would wear a beanie with her hair pulled forward to hide her injuries.

In one incident, defendant grabbed L.B. around the throat and choked her because she could not remember the correct order of the days of the week when defendant was teaching them to her. L.B. was choked to the point of unconsciousness; she gasped for air after defendant blew into her mouth.

Erika decided to go to the police rather than go home from work on December 31, 2014. After getting several calls from defendant, she was worried that he was in a bad mood after coming down off of drugs. When she went to the Calaveras Sheriff's department, Erika's front teeth were still missing, she had bruising on her hip from an assault two weeks before, and L.B. also had bruising on her face and neck. Erika never before told the authorities because she was afraid of defendant's response. He once told Erika that their children would grow up without parents if she went to the authorities.

Erika returned home with a police escort. As defendant was being escorted to the police car after being arrested, he told L.B. in a threatening manner, "Don't tell them anything. You don't want daddy to get in trouble, do you?"

4

L.B. told officers defendant had hit her before. Asked about her current bruising, L.B. said a boy on the playground did it, but later admitted defendant told her to say that.

In an interview with a child protective service social worker, L.B., who referred to penises and vaginas as "china," said her father licked her "china," choked her, and had her lick his "china." This surprised Erika, who had wondered before if something happened between L.B. and the former housemate, Nick Movine, when they lived in Sonora but had not suspected defendant. She also admitted that L.B. might have seen her and defendant having sex when they lived in the trailer.

L.B. testified that she lived in a trailer in California when she was five years old. She was eight years old at the time of the trial and had trouble remembering that far back. Her face was bruised when defendant was arrested; he had hit her in the face. L.B. was reluctant to get defendant into trouble because of "all of the stuff" he did to her. She did not want to discuss what defendant did. All L.B. could remember was that he punched her. L.B. agreed that she had been told not to talk about her injuries. She saw defendant do mean things to Erika, including punching her.

The results of a sexual assault examination on L.B. were within normal limits.

Defendant's jail calls with Erika were recorded. He frequently called her in violation of a restraining order preventing him from contacting Erika. Erika admitted that defendant, notwithstanding the restraining order, called her from jail and wrote letters to the children after his arrest. In one call, defendant told Erika to just testify that she lied. Another call contained a discussion of their using the name "Trinity" to refer to Erika in order to trick the system and still talk. Defendant also told Erika in one call to talk to L.B. so she understood the consequences of what she was doing.

A coworker of Erika's testified that she would miss work for extended periods, once returning with missing teeth. On December 31, 2014, the coworker overheard Erika on the phone crying and visibly upset. Erika told her about the domestic violence, and

they went to the police and sheriff's department together. Erika also said that defendant had threatened to kill her and her girls if she went to the police.

The former housemate Leeco Thach had seen Erika with two black eyes and missing teeth. L.B. and Erika were both terrified of defendant, who told Thach to mind her own business.

A video of L.B.'s preliminary hearing testimony was admitted into evidence. In the video, L.B. testified to defendant being responsible for bruising her face. Defendant also choked Erika. He had touched L.B.'s private parts or "china," licked her private parts and had her lick his private parts.

Called as a defense witness, Erika testified that she used sunglasses to hide the black eye defendant gave her, but did not wear them at work, where she used makeup to conceal the injury. L.B. still had trouble remembering details about the incidents and was reluctant to say what happened.

*Sanity Phase*

Defendant testified to having a history of mental disorder, including bipolar disorder, and at times could not tell right from wrong or control his actions. He had medications for his problems but had trouble staying on them. Defendant had been institutionalized due to concerns about being both suicidal and homicidal. He admitted to faking suicidal tendencies just to anger the guards. Defendant had a problem with people telling him what to do, so most jobs ended poorly for him.

Defendant was off of his medication and using illegal drugs when he lived in Angel's Camp. After testifying that his ability to control his actions lessened when he went off his medication, defendant clarified that his ideas of right and wrong at times do not align with what other people think. Defendant thought it was okay to hit his wife. He became more violent when he stopped taking his medication and started taking illicit drugs.

6

Two psychiatrists examined defendant and concluded he could understand the difference between right from wrong and understood the nature of his crimes.

DISCUSSION

I

*Continuance for Self-Representation*

Defendant contends the trial court deprived him of the right to represent himself by denying his request for a continuance made contemporaneously with his assertion of his right to self-representation. We disagree.

*A. Background*

The complaint was filed on January 5, 2015. On February 6, 2015, defense counsel expressed doubt about defendant's competency to stand trial. Defendant was found incompetent to stand trial on March 30, 2015. His competency was restored following a stay at Napa State Hospital and proceedings were resumed on July 13, 2015. That same day, defendant filed a *Marsden* motion and defense counsel filed a motion to be relieved of the appointment. The motion to relieve counsel was granted and substitute counsel was appointed the next day. Defendant was given additional time to enter his plea due to the change in counsel. Following a December 2015 preliminary hearing, defendant was arraigned on the information on January 4, 2016, with a jury trial set for May 4, 2016.

On April 5, 2016, defendant filed a petition to represent himself and filed another *Marsden* motion. After denying the *Marsden* motion, the trial court addressed defendant's request to represent himself. Defendant's written motion did not request any continuance beyond the May 4, 2016, date set for trial. When the trial court discussed defendant's request with him and took his *Faretta*[4] waiver, defendant did not mention

---

[4] *Faretta v. California* (1975) 422 U.S. 806 [42 L.Ed.2d 562] (*Faretta*).

7

needing any additional time. The court granted the *Faretta* motion and appointed prior counsel as standby advisory counsel. Since defendant was now representing himself, the court ordered the district attorney not to listen to any recordings of calls defendant made from jail.

The trial court shortly thereafter allowed defendant to have his mother as an unpaid legal research assistant, and affirmed the May 4, 2016, trial date. Defendant then asked, "Your Honor, I am going to ask if those dates can get postponed." The court declined. When defendant interjected, "So I can do more research," the court reiterated, "No." Defendant replied by asking to withdraw the *Faretta* motion. The trial court replied, "Because you even brought that up in your moving papers, that there would not be a continuance." The court accepted the withdrawal and withdrew the order prohibiting the district attorney from listening to defendant's calls from jail.

The trial court next addressed whether defendant would be entering a plea of not guilty by reason of insanity. After defendant said he never asked counsel to enter that plea, but may wish to do so later on, the court informed defendant it would allow an insanity plea now but not on the day of the trial. When the court reiterated that defendant had to decide whether to enter the insanity plea, defendant told the court, "[F]uck you."

*B. Analysis*

A defendant who represents himself " 'is not entitled either to privileges and indulgences not accorded attorneys or to privileges and indulgences not accorded to defendants who are represented by counsel.' [Citation.] But neither is he entitled to *less* consideration than such persons. In particular he must be given, if he requires it, as much time to prepare for trial as an attorney; and if a reasonable continuance is necessary for this purpose, it must be granted upon timely request." (*People v. Maddox* (1967) 67 Cal.2d 647, 653.)

Generally, continuances are disfavored in criminal cases. "[A]ll proceedings in criminal cases shall be set for trial and heard and determined at the earliest possible time.

8

To this end, the Legislature finds that the criminal courts are becoming increasingly congested . . . . Excessive continuances contribute substantially to this congestion . . . ." (§ 1050, subd. (a).) Therefore, trial courts may grant motions to continue based only on a showing of good cause. (§ 1050, subd. (e).)

" 'Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances;. . . .' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 508.) The court must consider " ' "not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) "In determining whether a denial [of a motion to continue] was so arbitrary as to deny due process, the appellate court looks to the circumstances of each case and to the reasons presented for the request. [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 1012-1013, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

While a court must grant a reasonable request for a continuance made in conjunction with a timely *Faretta* motion (*People v. Hill* (1983) 148 Cal.App.3d 744, 757; *People v. Morgan* (1980) 101 Cal.App.3d 523, 531), if the defendant already has sufficient time to prepare for trial, then a continuance does not have to be granted. (*People v. Clark* (1992) 3 Cal.4th 41, 110-111; *People v. Jackson* (1978) 88 Cal.App.3d 490, 502, disapproved on other grounds in *People v. Barnum* (2003) 29 Cal.4th 1210, 1221-1222 & fn. 1.)

*Jackson* provides an example of a continuance being properly denied because the *Faretta* defendant already had sufficient time to prepare for a trial. The defendant in *Jackson* was given 10 days to prepare for trial after his *Faretta* motion was granted.

9

(*People v. Jackson, supra*, 88 Cal.App.3d at p. 502.) "Rather than showing a reasonable need for a continuance, the record demonstrates that defendant had ample time to prepare his defense. He had reason to believe that he would be representing himself 73 days prior to trial and was given 10 days to prepare his defense after his *Faretta* motion was formally granted. Further, he had actively participated in his defense prior to that time." (*Ibid.*) The denial of the continuance was not an abuse of discretion. (*Ibid.*)

Defendant had nearly a month remaining to prepare for trial when he requested the continuance. The trial had already been considerably delayed and defendant, like the defendant in *Jackson*, had actively participated in the defense before requesting the continuance. At the *Marsden* hearing just before the *Faretta* hearing, defendant told the trial court he had asked trial counsel to file motions to establish a greater coercion between his wife and daughter at the preliminary hearing. Defendant also complained of receiving incomplete transcripts and had previously discussed *Faretta* with counsel. As the trial court observed following the restoration of defendant's competency, defendant felt "very strongly and passionately about the case." In short, defendant was intimately involved with his case well before the requested continuance. Given the amount of time between granting the *Faretta* motion and the day of trial, defendant's close involvement with his case, and the considerable time the case had already taken, it was within the trial court's discretion to deny the requested continuance as unreasonable.

We are not persuaded by defendant's arguments to the contrary. Defendant's claim that he needed extra time to research the procedures for and how to plead a dual plea of not guilty and not guilty by reason of insanity founders on defendant's equivocal conduct regarding such a plea at the time he requested the continuance; he did not decide to change his plea until a subsequent hearing, and he never gave this as a reason for granting the continuance. Defendant also faults the trial court for not asking why defendant wanted the continuance and for how long he wanted it. Accepting this argument would give a self-represented defendant greater privilege than appointed or

10

retained counsel, who both bear the burden of justifying any requested continuance without waiting for the trial court to ask.  The Supreme Court held in *Maddox* that a self-represented defendant is not entitled to greater privileges than counsel (see *People v. Maddox, supra*, 67 Cal.2d at p. 653), and we are of course bound to follow the Supreme Court's directive.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Defendant's claim is without merit.[5]

II

*Competency to Stand Trial*

Defendant contends the trial court prejudicially erred in failing to hold a competency hearing at some point after his competency was restored and proceedings resumed.

*A. Background*

*1. Proceedings up to the Restoration of Competency*

On January 7, 2015, the trial court granted defense counsel's request to be recused because defendant was involved in fights at jail with people represented by counsel. Defendant responded by telling the court, he felt like the whole state of California was picking on him because he was from Arizona.  He also said he was supposed to have open heart surgery, "and they won't even listen to my heart.  They won't even do a scope."  Two days later, when appearing with new counsel, defendant brought up again that a jail doctor had not listened to his heart.  When the court told defendant this was not a matter between defendant and the court, defendant asked for a new and speedy trial.

---

[5]  Although the trial court erroneously told defendant his *Faretta* motion stated that no continuance was needed, this mistake does not render the denial an abuse of discretion. The court made this statement after denying the continuance, and neither defendant nor defense counsel (who now represented defendant after defendant's request to withdraw the *Faretta* waiver was granted) corrected the court.  It is not clear the trial court based its denial on this invalid reason, and the failure to correct the court's misperception forfeits any claim of error on appeal.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)

11

On February 6, 2015, defense counsel moved for a section 1368 competency evaluation, which the trial court granted without objection. The court suspended proceedings and ordered defendant to be evaluated.

Two psychiatrists evaluated defendant. Dr. Kent Rogerson noted defendant reported using "all the drugs," including heroin and methamphetamine, which would make him a "felon" who wants to "beat up people and hurt people." His diagnostic impression of defendant was that he had untreated bipolar disorder with hypomania, substance use disorder, and antisocial personality disorder. Defendant knew and understood the charges but was not able to rationally assist counsel in presenting his defense. His hypomania required treatment with mood-stabilizing medication and probably an antipsychotic agent. Six to eight weeks of treatment should restore his competence.

Dr. Gary Cavanaugh reported defendant told him his DNA was contaminated by his father's exposure to Agent Orange in Vietnam, his having been treated with Adderall, Risperdal, Lithium, and other medications as a child, and having been placed in a group home as a youth due to aggression. He was his father's "punching bag" and was attending school "behind barbed wire" starting in the seventh grade. Defendant said he really wanted to fight people when he drinks alcohol and reported a history of using methamphetamine, PCP, and marijuana. He also reported having been diagnosed as "bipolar 1, paranoid disorder, PTSD" and also schizophrenia; defendant had been prescribed Adderall, Risperidone, and Lithium. Defendant had been in a psychiatric hospital three times as a child and had been in a "mental home" for a year.

Dr. Cavanaugh diagnosed defendant with Bipolar 1 Disorder, currently manic, Poly Substance Abuse, previous diagnosis of Conduct Disorder, and ruled out ADHD and Antisocial Personality Disorder. Defendant knew and understood the nature and purpose of the proceedings against him, but defendant's "volatility, loquacious and pressured speech, thought disorder, significant paranoid ideation, and agitation all combine to

12

render him unable to rationally assist counsel in presenting his defense." Treatment with mood-stabilizing and neuroleptic medication should render him competent to rationally assist counsel.

The trial court found defendant incompetent to stand trial on March 30, 2015. At the time the court made the finding, defendant, against the advice of counsel, gave a rambling statement regarding his rights as a "Sovereign citizen" and invoked his natural rights. Defendant asserted he was competent and "You guys are violating my rights" before the court ordered him escorted out of the courtroom. Based on defendant's behavior, the trial court ruled that defendant would have to make future court appearances behind security glass.

Finding the administration of antipsychotic medication was necessary to restore competency, the trial court ordered defendant to Napa State Hospital for treatment.

Napa State Hospital certified defendant as competent to stand trial on June 30, 2015. The accompanying report by forensic psychologist Dr. Julia Patterson noted there were currently no records supporting defendant's reported history of psychiatric treatment. Since his intake interview at the hospital, defendant presented with intermittent irritability, pressured speech, and aggression, all of which are related to personality disorder, but no other signs of mental illness. Although defendant was using Oxycontin, methamphetamine, and marijuana at the time of the charged offenses, it was unclear the extent that drug use played in prior mental illness symptoms. Since there was concern defendant malingered mental illness in the past, a diagnosis of substance-induced psychotic or mood disorder was not warranted at the time.

The possibility that defendant was malingering a mental illness to appear incompetent to stand trial was strongly considered. Hospital records showed defendant made numerous statements showing a desire to stay at the hospital. During the test given at intake, defendant frequently tried to debate the questions and sometimes endorsed a response, laughed, then changed his answers. Defendant also declined numerous

13

meetings with staff to evaluate him. Lack of cooperation could indicate malingering, and defendant met the criteria for antisocial personality disorder, another possible indicator of malingering.

Defendant engaged in manipulative and threatening behavior to get what he wanted. He reported that his complaints of suicidal ideation at jail were attempts to manipulate the system. He threatened violence if he was returned to court as competent before getting a cardiology consultation. Defendant also said that he would attack somebody to show that he is crazy. Defendant once lay down on the floor when told his request for pain medication would not be resolved until the next day; after the protest led to his getting medication, he got up and went outside to play football with his peers, showing no visible signs of pain or distress. During testing, defendant made multiple comments indicating he was considering feigning illness or acute problems in order to appear more distressed than he currently appeared.

Since defendant presented no symptoms and said he was competent at the time of the evaluation, he was not found to be malingering, although he may have been feigning or exaggerating symptoms in the past. He was taking one psychotropic medication, valproic acid, and was compliant with his medication regimen. The treatment time found defendant's signs of behavioral instability was the result of a personality disorder, borderline and antisocial personality disorder, rather than a psychotic or mood disorder. An evaluator likewise concluded that defendant's pattern of impulsivity, behavioral volatility, and poorly controlled anger appeared to be the result of enduring personality characteristics rather than any acute psychiatric issues.

After personally evaluating defendant, Dr. Patterson found he was not experiencing any symptoms of mental illness that would preclude him from rationally assisting his attorney in his defense. While defendant had a very negative opinion of his attorney, Dr. Patterson believed he had the capacity to work with counsel in a rational manner. Defendant did not exhibit any signs of mental illness, was able to communicate

14

coherently and effectively, but personality traits related to borderline and antisocial personality disorders would likely make it difficult for him to work amicably with counsel. Since he understood his case and the nature of the proceedings, defendant was competent to stand trial.

### 2. Proceedings After Competency is Restored

At the July 10, 2015, mental competency hearing, defendant, again behind glass, told the trial court, "I was court-ordered to take anti-psychotics, they cut me off a week prior to me coming here," and that he was "only taking one mood stabilizer right now." The court replied that it did not know how to address this other than stating that any medication defendant was ordered to take, he should still be ordered to take. After defendant told the court he felt he was working better on the anti-psychotic he was taking, the trial court ordered that defendant "go back on it or at least follow all prescribed medication."

The trial court reinstated proceedings at the continued competency hearing on July 13, 2015. Asked about his medication by the trial court, defendant said he had not yet talked to a local doctor. When the court related the discussion regarding medication at the July 10 proceeding, defense counsel said, "I believe those meds were probably prescribed because of the competency proceeding. I think they will play a role in his continued competency." After further discussion with defense counsel and the prosecutor, the trial court ordered the jail "to continue meds prescribed by Napa that need to be continued." Defense counsel then asked to be relieved, and defendant filed a written *Marsden* motion.

At the hearing on the *Marsden* motion on July 16, 2015, defendant and counsel agreed there was an irreparable breakdown in their relationship. Defendant brought up that defense counsel had run for district attorney and had been on the board for "Domestic Violence Advocates in Arizona." Defense counsel agreed he had run for district attorney but denied ever having served on a board for a domestic violence

15

organization in Arizona or having done any work of significance in that state. The trial court granted the motion.

That same day, the trial court commented that defendant's behavior the last two days was "very good," and it was considering defendant's request to have the glass removed. One of three attorneys present, Steven Cilenti, was willing to consider taking the appointment as defense counsel. Cilenti asked defendant in court, "I understand that the jail is giving you the Depakote that you got from Napa?" Defendant replied that it was. When the prosecutor stated, "According to the jail, they were always giving him the meds," defendant replied, "Well, I was taking Zyprexa and Haldol, but I am not taking that currently." The trial court replied, "if there is something that you were prescribed that you were supposed to be taking, you need to talk about that" as that was the purpose of the court's prior order.

Cilenti told the trial court he accepted representation for defendant at a July 23, 2015, hearing. The trial court also told defendant he had been behaving very well in court and in jail, and that it did not want to hear about him acting up.

At a September 11, 2015 hearing, defense counsel told the trial court:

"Apparently he had been having difficulty—he has been asking for medications that were prescribed to him at Napa and he has not received them. He has talked to medical people.

"And if I understand him correctly, they are telling him he is getting all that he needs and not giving him what he was prescribed at Napa here."

Defendant agreed with counsel's statement, while the prosecutor said that defendant told his mother he voluntarily refused to take the medication. Defense counsel responded that while defendant did so in the past, he was now asking for the full medication he was prescribed at Napa. When the trial court responded it had ordered the jail to give him the prescribed medication, defendant replied, "That is only one pill" and he had "an extensive history of mental illness" since he was eight years old. The court

16

said it had ordered defendant receive all prescribed medications. It said that if defendant was prescribed medication and had a prescription for it, the court was "ordering that the jail give it to you." Defendant wondered why he was getting three pills at Napa and was calmer, but "here they cut me off two days prior to coming into the jail." Defendant said his "chemical balance is all off. I am freaking out in here, you know." When the court replied there was nothing else it could do, defendant asked if he could see another psychiatrist for a second opinion. The trial court told defendant it had no control over the jail other than to order what it already ordered. Defendant said it was a violation of his rights not to be properly medicated.

At an August 28, 2015 hearing, defendant asked for a new district attorney and was told by the trial court to consult with counsel. On December 2, 2015, at the beginning of the preliminary hearing, defense counsel told the court he had a long talk with defendant about the consequences of behavior not acceptable to the court and that defendant would like to remain in the courtroom but understands what would happen if he acted out. The court later reminded defendant he had been disruptive several times before proceedings were suspended under section 1368, but he had since been very cooperative, which the court greatly appreciated. While defendant was now appearing in court rather than behind glass, the court would remove defendant if he was disruptive. It noted that on multiple occasions defendant tried to communicate with people other than his attorney in the courtroom by yelling or throwing things. Defendant acknowledged understanding what the court required of his behavior.

Defendant engaged in periodic outbursts or was in conflict with counsel at various times throughout the remainder of the trial. Defendant yelled out, "Wrong" during the second day of the preliminary hearing, but the trial court expressed its appreciation for defendant's cooperation at the end of that day. He refused to attend court on March 25, 2016. During the *Marsden* hearing that immediately preceded the brief *Faretta* waiver, counsel informed the court of problems with defendant regarding defendant's desire to

17

raise inappropriate issues and his persistent disclosure of defenses when making calls to his wife that were recorded. Counsel also told the court he thought defendant was frustrated because defendant did not understand why he could not serve his time at Napa State Hospital, and defendant figured that discharging counsel would allow him to delay matters by getting someone who could file endless motions. Defendant engaged in a lengthy, rambling statement bringing up his desire for a speedy trial, counsel's failure to request property that would show his wife's motive, counsel's failure to give other information, his disagreement with a change of plea motion, and his desire to know if he can do his time in Napa State Hospital. He repeatedly interrupted the trial court as it denied the motion.

As a result of defendant's outbursts during the *Faretta* hearing,[6] he appeared behind glass at the next hearing on April 18, 2016. After the trial court admonished defendant for his "incredibly disrespectful" display at the *Faretta* hearing, defendant said he felt the court was violating his rights and his frustration built up and exploded. Defendant also told the court he had not been on his medication.

After defendant was permitted to change his plea to include not guilty by reason of insanity, he was evaluated by two psychologists in May 2016. Dr. John Chellsen found defendant's "associations were intact, linear, and coherent." Defendant told him, "[t]hey won't give me Zyprexa from Napa State Hospital." Believing he would do better at Napa State Hospital than in prison, defendant said he was temporarily insane. A test given to him could not be scored because he gave both true and false responses on numerous questions and wrote notes on the front and back of the test forms. Dr. Chellsen diagnosed defendant with history of poly substance abuse, mixed personality disorder with

---

[6] As recounted in Part I, *ante*.

18

borderline, antisocial, and paranoid features, and bipolar disorder, and found he was legally sane at the time of the alleged offenses.

Dr. Philip Trompetter noted defendant's medical records were consistent with his reported history of psychiatric hospitalizations. The records showed a lengthy history of mood instability that could be consistent with bipolar disorder but were better described for defendant as borderline personality disorder and antisocial personality disorder. Defendant took little or no responsibility for his actions, tended to act out when he was tense, seemed to act out with very little guilt or contrition, and was unrestrained by the restrictions on others. Defendant was not delusional, though he had a "very nonpsychotic, paranoid outlook in general."

Defendant failed to appear at a June 7, 2016 hearing. Counsel explained defendant was not being cooperative and counsel was willing to waive defendant's appearance in order to avoid another outburst. Defendant sent a letter to the trial court that day stating he wanted to attend but was not allowed to and that he wanted to replace counsel, who was acting like a surrogate prosecutor. A completed *Marsden* form was attached to the letter.

Appearing behind glass at the June 22, 2016 *Marsden* hearing, defendant reiterated he wanted to attend court on June 6 and 7. Defendant made numerous claims about subjects dropping off unsealed legal packages at the jail, not filing various motions defendant wanted, having met the defense investigator only once, and failure to provide requested documents. Following counsel's response, defendant wondered if counsel had dementia and told him, "you are not an agent or a surrogate DA." After further argument from defendant, counsel told the trial court if defendant continued doing this, counsel would have to advise the court there was a breakdown in communications, and it sounded like defendant was trying to create that situation. The trial court denied the motion and defendant replied that he would seek a dismissal with prejudice. Back in open court, the trial court told defendant his behavior was much improved.

19

Defendant, who was still behind glass at a July 15, 2016 hearing, had filed a new *Marsden* motion. Counsel told the trial court he was ready to be relieved as there was an irreconcilable conflict between them and a breakdown in communication that jeopardized defendant's representation. Defendant had become aggressive with counsel during their last communication. While counsel was explaining the prosecution's plea offer, defendant "just pushed himself up from the chair, and of course there is a big, thick piece of glass between the two of us, made a gesture closing that distance very rapidly and raising his voice." Counsel considered this a threat of violence. Defendant replied it was not an act of aggression and complained that counsel kept offering him the same plea deal every time he talked to defendant. The trial court said it did not have to conduct a *Marsden* hearing at this point, and relieved counsel. The court also advised defendant he could lose his right to counsel through serious misconduct such as threats of violence towards his appointed attorney. The court then appointed new counsel who had already agreed to represent defendant.

On August 2, 2016, defendant was charged in a separate matter with possession of a weapon in a penal institution. After the prosecutor withdrew its plea offer on October 4, 2016, defendant told the trial court he did not even know what the deal was. When the prosecutor replied that defendant talked about the plea with his mother often, defendant responded that he did not know all of the details.

Defendant was no longer behind glass at the March 7, 2017 trial readiness conference. Defendant, against the advice of counsel made a lengthy, rambling statement to the trial court in which he asserted, among other things, a First Amendment right, brought up a lack of communication with counsel regarding his dual plea of not guilty and not guilty by reason of insanity, counsel's failure to file various motions, look into defenses, or seek evidence defendant thought was important, asserted there was a conflict of interest with counsel, he had not been given discovery, questioned the court's judgment, reminded the court of ABA (American Bar Association) standards for

20

competent representation, and asserted the prosecutor prepared false transcripts implicating him and should be removed. When the prosecutor asked if this was a *Marsden* motion, defendant said no, but he was tired of the delays and wanted a fair trial. Two days later, the trial court granted the prosecution's request for an order requiring defendant to attend trial in restraints, based on his behavior in court, with counsel, and two incidents in jail involving weapons.[7]

The only incident during the prosecution's presentation of evidence was defendant making a gesture towards a witness to "be quiet or something." While waiving his right to testify following the conclusion of the prosecution case, defendant said, "My lawyer advised me that if I say anything slightly different whatever than we talked about, yeah, I would have to represent myself for the rest of the trial. So now I'm like confused on the whole situation, and I'm choosing not to testify for that reason."[8] During jury deliberations in the sanity phase, defendant asked the trial court if he could submit "a bunch of documentation" concerning his prescriptions, and a few moments later asked the court to instruct the jury that an insanity verdict "still has a life attachment to it."

Another *Marsden* hearing was held on June 6, 2017, after the sanity verdict. The trial court had to admonish defendant not to interrupt. In addition to reiterating earlier complaints about his representation, defendant was upset with the failure to test his wife for an STD, as the positive test would show he did not molest his daughter since his wife gave him herpes and his daughter did not have it. He also made a lengthy statement claiming counsel was not aware of the not guilty by reason of insanity plea, which counsel disputed. The trial court denied the *Marsden* motion.

---

[7] At the sentencing, defendant had been involved in 103 incidents at jail, including cursing at his attorney.

[8] Defense counsel clarified that he told defendant if he testified in the narrative, counsel could not ethically ask him further questions.

21

After the trial court denied defense counsel's new trial motion following the *Marsden* hearing, defendant made a motion for dismissal based on insufficient evidence due to hearsay, which the court denied. Defendant then asserted on his own that there were insufficient breaks during the trial without his evidence to convict because the evidence was hearsay, giving breaks during trial without his consent violated his rights, and he was never present during jury questions. At sentencing, defendant interrupted the court and the attorneys numerous times and said he would not register as a sex offender or comply with the restraining order issued against him.

*B. Discussion*

Defendant contends the trial court erred in failing to hold a competency hearing after proceedings were reinstated because there was substantial evidence he lost his competency to stand trial.

Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibits the trial of a criminal defendant while he or she is mentally incompetent. (*People v. Ary* (2011) 51 Cal.4th 510, 517-518; § 1367, subd. (a).) "A defendant is deemed competent to stand trial only if he ' "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" 'and ' "has a rational as well as factual understanding of the proceedings against him." ' [Citation.]" (*Ary,* at p. 517; see also § 1367, subd. (a) ["A defendant is mentally incompetent for purposes of this chapter if, as a result of a mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."].) "When a trial court is presented with evidence that raises a reasonable doubt about a defendant's mental competence to stand trial, federal due process principles [as well as state law] require that trial proceedings be suspended and a hearing be held to determine the defendant's competence. [Citations.] Only upon a determination that the defendant is mentally

competent may the matter proceed to trial." (*Ary,* at p. 517; see also § 1368, subd. (a).)[9] Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. (*People v. Rogers* (2006) 39 Cal.4th 826, 847 *(Rogers).*) The court's duty to conduct a competency hearing may arise at any time prior to judgment. (*Ibid.*) A trial court's decision whether or not to hold a competency hearing is entitled to deference because the court has the opportunity to observe the defendant during trial. (*People v. Danielson* (1992) 3 Cal. 4th 691, 727 overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *Drope v. Missouri* (1975) 420 U.S. 162, 181 [43 L.Ed.2d 103, 118-119].)

"If, after a competency hearing, the defendant is found competent to stand trial, a trial court may rely on that finding unless the court ' "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.' [Citations.]" (*People v. Rodas* (2018) 6 Cal.5th 219, 231 *(Rodas).*) This rule does not "alter or displace the basic constitutional requirement . . . [that] require[s] the court to suspend criminal proceedings and conduct a competence hearing upon receipt of substantial evidence of incompetence even if other information points toward competence." (*Id.* at p. 234.) Rather, it clarifies "that the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively

---

[9] As relevant here, section 1368, subdivision (a), provides: "If, during the pendency of an action and prior to judgment,. . . a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent. If the defendant is not represented by counsel, the court shall appoint counsel. At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time."

minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Id*. at pp. 234-235.) This is a "fact-specific inquiry." (*Id*. at p. 235.)

"But when a formerly incompetent defendant has been restored to competence solely or primarily through administration of medication, evidence that the defendant is no longer taking his medication and is again exhibiting signs of incompetence will generally establish such a change in circumstances and will call for additional, formal investigation before trial may proceed. In the face of such evidence, a trial court's failure to suspend proceedings violates the constitutional guarantee of due process in criminal trials. [Citation.]" (*Rodas, supra*, 6 Cal.5th at p. 223.) Failure to declare a doubt and to conduct a competency hearing when there is substantial evidence of incompetence requires reversal of the judgment. (*Rogers, supra*, 39 Cal.4th at p. 847.)

Defendant claims his behavior after competency was restored is very substantial evidence he had become incompetent again, thus requiring the trial court to hold another competency hearing. According to defendant, when he was found competent and returned to court, he was not given the antipsychotics that had restored him to competency. This in turn led defendant to become violent, paranoid, and extremely impulsive in court, which for a second time rendered him unable to rationally assist counsel in presenting his defense. He finds this to be substantial evidence that he became incompetent again without the necessary antipsychotic medications, and the trial court's failure to order another competency hearing violated his due process rights.

As we have set forth at some length, defendant's behavior after competency was restored was replete with examples of misbehavior, rambling speeches, desire to present unfounded or untenable defenses, motions, and evidence. He also engaged in threatening behavior with one of his attorneys since competency was restored, and had significant behavioral problems in jail, including the possession of weapons. He also had considerable difficulty cooperating with counsel, filing numerous *Marsden* motions, a

24

*Faretta* motion, and going through three attorneys in the proceedings after he was found competent.

Unpleasant, bizarre, or even threatening behavior does not alone raise sufficient doubt to require an inquiry into a defendant's competency to be tried. "[M]ore is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]." (*People v. Laudermilk* (1967) 67 Cal.2d 272, 285.) While a defendant's competency to stand trial is evaluated from all the surrounding circumstances, only evidence related to a defendant's competency to stand trial, rather than general evidence of mental illness or inappropriate behavior, will trigger the need for a competency hearing. (See *People v. Ghobrial* (2018) 5 Cal.5th 250, 270 [evidence must go to competency to stand trial rather than merely establishing existence of mental illness that could influence competency]; *Rogers, supra*, 39 Cal.4th at p. 847 [same].)

Likewise, an unwillingness, rather than an inability, to assist counsel will not render a defendant incompetent to stand trial. "If there is testimony from a qualified expert that, because of a mental disorder, a defendant truly lacks the ability to cooperate with counsel, a competency hearing is required. [Citation.] Here, however, there was no substantial evidence that defendant's lack of cooperation stemmed from inability rather than unwillingness, and the trial court's comments suggest that it found defendant's problem to be of the latter type rather than the former. In these circumstances, no competency hearing was required." (*People v. Lewis* (2008) 43 Cal.4th 415, 526.)

The two experts at the competency hearing found defendant suffered from mental illness that rendered him incapable of assisting in his defense and required treatment with antipsychotics. Defendant's treatment at Napa State Hospital presented very different diagnoses and treatment than what would be expected from the experts' reports. The

25

report from Napa State Hospital found defendant had a personality disorder, but no mental illness. The evaluators found defendant engaged in manipulative and threatening behavior to get what he wants. His behavior there led the evaluators to strongly consider he was malingering in order to be found incompetent to stand trial, but his lack of any symptoms when he was evaluated as competent prevented such a finding. He was taking only one drug, valproic acid when he was found competent.

The evidence shows he was taking only one drug, Depakote, following the restoration of competency. Shortly after competency was restored, defendant told the trial court he was taking this drug but was not taking two other drugs, Zyprexa and Haldol, that were administered to him at Napa State Hospital. Depakote is a means of administering valproic acid to a patient. "Depakote consists of an equimolar mixture of the [valproic] acid and sodium salt derivatives of its active species, the valproate ion." (*Abbott Labs. v. Torpharm, Inc.* (Fed. Cir. 2002) 300 F.3d 1367, 1370.) Valproic acid is thus the active ingredient in Depakote. (*Abbott Labs. v. Young* (D.C. Cir. 1990) 920 F.2d 984, 986.) Depakote is used "for treatment of epilepsy as well as migraine headaches and bipolar disorder." (*Abbott Labs. v. Torpharm, Inc., supra*, 300 F.3d at. p. 1370) While the report from Napa State Hospital indicated defendant was given Haldol during his stay, he was not taking it when found competent, and the report did not recommend prescribing him this medication in order to maintain competency. At the sanity trial, expert testimony described it as a mood stabilizer often used to help manage difficult behavioral problems.

In light of the report from Napa State Hospital, defendant's statement he was not being given Zyprexa and Haldol was insufficient to trigger an inquiry into his competence to be tried. The only drug being given to him following the restoration of competency, administered the same medication as was given to him at Napa State Hospital when competency was restored. In addition, the trial court ordered the jail on more than one occasion to administer the drugs Napa State Hospital had prescribed to

26

him.  While there is evidence defendant may have refused to take the Depakote at some point,[10] defendant testified at the sanity phase that he was taking the drug.  We conclude defendant was being given the one drug administered to him when found competent.

*Rodas* presents a notable contrast to the case before us.  There, the medical report certifying defendant's competency to stand trial recommended the defendant continue taking his prescribed medication to maintain competence, and the medical director sent a letter accompanying the certification stating it was " 'important that the individual remain on this medication for his own personal benefit and to enable him to be certified under Section 1372 of the Penal Code.' " (*Rodas, supra*, 6 Cal.5th at p. 226.)  There is no such finding from the certifying hospital here, and, unlike *Rodas*, defendant here was being given the one medication he was getting when competency was restored, and the trial court ordered that he be given it.  (See *id.* at pp. 226-227 [noting the trial court never ordered defendant be given the medication after defense counsel suggested it and defendant said he was not taking the drugs].)

This case does not present the situation found in *Rodas* and therefore deference to the trial court's observation of defendant is appropriate.  While defendant misbehaved numerous times and had considerable difficulty with counsel, his behavior at trial was much better, he was able to coherently testify at the sanity trial and was able to keep his fourth and last counsel long enough to adequately prepare for trial and continue through trial and sentencing.  We conclude there was not sufficient evidence or changed circumstances casting substantial doubt on his competency to be tried.

---

**10**  Dr. Chellsen testified at the sanity trial that defendant told him on May 6, 2016, he was not taking his prescribed Depakote because it did not have the metaphoric high he would get from the Zyprexa he was prescribed at Napa State Hospital.

27

## III

### *Griffin Misconduct*

Defendant contends the prosecutor committed misconduct under *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106]) through argument on rebuttal that addressed his failure to testify. Although the prosecutor's comments were improper, we find the immediate objection from defense counsel and admonishment from the trial court removed any prejudice from the comments.

*A. Background*

The prosecutor argued during his closing argument that in a phone call with Erika from jail, defendant admitted molesting L.B. when he said, "Well if I did it," because "[h]e leaves it open for the possibility . . . ." The prosecutor also told the jury it was up to them to determine what this sentence meant. Defense counsel argued that in his phone calls to his wife, defendant "says a lot of things that incriminate himself, but what he does not say is that he molested that little girl. He never said that." Counsel also told the jury, "You can listen to those calls. He said he didn't do it."

The prosecutor argued during rebuttal: "So, yesterday we talked a little bit about how the defendant made that statement about the sexual assault counts against [L.B.] 'Well, if I did it, right?' He opened himself up to, yeah, it's a possibility it could have happened, and if it did happen it happened in the trailer just like [L.B.] said, but I don't remember because I was doing all those drugs, right?

"And then he makes a statement, 'I'm pretty fuckin sure I—okay.' Now I told you I wasn't going to tell you what that said. The defendant wants you to believe he said didn't, okay, but you don't—you don't know what he said, because he didn't get up on the stand and he didn't say—."

Defense counsel immediately objected. The trial court sustained the objection and defense counsel asked for an instruction from the trial court. The court gave the following instruction:

28

"The defendant has a right not to testify and can't be used in any way, including argument by counsel, the defendant's lack of testimony. As I have instructed you earlier in the case, you shall not consider in any issue in this case the fact that the defendant has chosen not to testify."[11]

The prosecutor then argued, "So you have to listen to that, and you have to decide what it was that was said. That is your decision and your decision only."

Defendant subsequently moved for a mistrial based on *Griffin* misconduct. The trial court said, "I cringed in my chair" when the prosecutor made the remark, but in light of "all the overwhelming evidence that was offered in this case," it concluded the jury followed the admonition and found that the error did not "result in a miscarriage of justice and that it would and absent the error be more favorable result been to the defendant" and denied the motion.

*B. Analysis*

A prosecutor commits misconduct under *Griffin* if he or she " 'comment[s] upon a defendant's failure to testify in his or her own behalf.' " (*People v. Thomas* (2012) 54 Cal.4th 908, 945.) *Griffin* error is evaluated under the harmless beyond a reasonable doubt standard. (*People v. Hovey* (1988) 44 Cal.3d 543, 572.)

The comment at issue did not state defendant was guilty due to his silence, but rather drew an improper inference from his silence. The improper inference that the jury should conclude defendant's jail call admitted his guilt because he did not testify otherwise was *Griffin* misconduct.

---

[11] The trial court had previously instructed the jury with CALCRIM No. 355 as follows: "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider for any reason at all that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

Before the improper argument, the jury was instructed with CALCRIM No. 355 that it could not consider defendant's exercise of his right to silence. Immediately after the *Griffin* misconduct, the defense objected, and the trial court instructed the jury not to consider defendant's silence and reminded them about the CALCRIM No. 355 instruction. A curative instruction and giving CALCRIM No. 355 can render *Griffin* misconduct harmless. (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1274.) We presume the jury followed the trial court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) In light of the instructions, we are convinced beyond a reasonable doubt that defendant would not have achieved a more favorable result had the misconduct not been committed.

IV

*Waiver of Right to Testify*

Defendant contends that he invalidly waived his right to testify.

*A. Background*

Just before the defense rested at the guilt phase of the trial, defense counsel told the trial court: "I've advised Mr. Brevik of his right to testify, that it's 100 percent his decision, given him an idea generally of what questions would be asked by me, what questions I would expect the district attorney to ask. And we had a conversation about it last weekend in private. We had a conversation over the weekend in private. And Mr. Brevik I believe his decision is not to testify. Is that right?" Defendant replied, "Um, yeah."

The trial court then remarked, "The Court also explained to Mr. Brevik this morning when we had our informal discussions off the record that his testimony—or it is solely his decision whether he chooses to testify or not. And you chose not to testify, correct?" Defendant said, "Well, I told you my reasoning earlier."

After defense counsel invited defendant to "put it on the record now," defendant said: "My lawyer advised me that if I say anything slightly different or whatever than we

30

talked about, yeah, I would have to represent myself for the rest of the trial. So now I'm like confused on the whole situation, and I'm choosing not to testify for that reason."

Defense counsel replied: "To be clear, your Honor, I've always advised him if he gets up and—essentially I've advised him what would happen if—what would cause him to testify in a narrative, which is something that would prevent me from asking further questions ethically." Defendant said, "I don't understand." Defense counsel responded, "And I think we went over it pretty well at the jail what that means."

The trial court then said the jury would be advised when it returned that the defense rested, and moved to the next subject, jury instructions.

*B. Analysis*

A criminal defendant has a constitutional right to testify in his or her own defense. (*Rock v. Arkansas* (1987) 483 U.S. 44, 51 [97 L.Ed.2d 37, 46].) A defendant who wants to testify may even do so over the objection of his attorney. (*People v. Robles* (1970) 2 Cal.3d 205, 215.) "When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on his claim that despite expressing to counsel his desire to testify, he was deprived of that opportunity.' [Citations.]" (*People v. Alcala* (1992) 4 Cal.4th 742, 805-806.) Accordingly, "[a] trial court has no duty to give such advice or seek an explicit waiver, unless a conflict with counsel comes to its attention. [Citations.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 762.)

Defendant argues the colloquy shows the waiver of his right to testify was not knowing and intelligent and therefore invalid. In support of this contention, defendant cites federal circuit court authority finding a defendant's right to testify must be knowingly and intelligently waived. (See *United States v. Pennycooke* (3rd Cir. 1995) 65 F.3d 9, 11-12; *United States v. Hung Thien Ly* (11th Cir. 2011) 646 F.3d 1307, 1317; *Ward v. Sternes* (7th Cir. 2003) 334 F.3d 696, 705-708.) Those cases do not establish a broad waiver requirement for the right to testify.

31

*Pennycooke* affirmed the general rule that an explicit waiver of the right to testify was not required, but recognized that "in exceptional, narrowly defined circumstances, judicial interjection through a direct colloquy with the defendant may be required to ensure that the defendant's right to testify is protected." (*United States v. Pennycooke, supra*, 65 F.3d at p. 12.) It gave as examples a defendant repeated interrupting the trial court with expressions of intent to testify, or more generally, "[w]here, in furtherance of trial strategy, defense counsel nullifies a defendant's right to testify over the defendant's protest . . . ." (*Id.* at p. 13.) *Ly* is likewise inapposite as it involved the trial court's failure to correct a pro per defendant's express misunderstanding of his right to testify. (*United States v. Hung Thien Ly, supra*, 646 F.3d at p. 1317.) It was also premised on the extra protections afforded pro se litigants and distinguished circuit court precedent holding trial courts had no sua sponte duty to colloquy defendants on the right to testify. (*Id.* at pp. 1315-1316.) *Sternes* involved a defendant's ambiguous ratification of trial counsel's decision for him not to testify. (*Ward v. Sternes, supra*, 334 F.3d at p. 705.)

Defendant clearly affirmed he did not want to testify at the guilt phase, explicitly agreeing with counsel's statement that counsel had explained the right to testify, that the decision to make was defendants, and that defendant was going to decline to testify. The trial court noted it had informally discussed the matter with defendant that morning, and when asked by the trial court to put that discussion on record, defendant replied that he had told the trial court his reasoning. After further prompting from defense counsel, defendant said he would have to represent himself throughout the rest of his trial if he testified and was now confused. When counsel then corrected defendant's statement by noting he had told defendant of the problems counsel would face if defendant gave narrative testimony, defendant concluded by stating he did not understand, and counsel responding that they went over this matter very well in jail.

Defendant's claim of not understanding was made as a reaction to defense counsel's statement regarding his prior explanation to defendant about the problems with

his desire to testify narratively. He did not claim a lack of understanding when he agreed with counsel's explanation of his rights and the decision not to testify. There was never any question defendant understood the nature of the proceedings. The experts who initially found him incompetent to stand trial opined he understood the nature of the proceedings but was incompetent because he could not cooperate with counsel. Given the ample evidence defendant engaged in manipulative behavior to get his way throughout the proceedings and defendant's express waiver of the right to testify, we conclude the trial implicitly concluded defendant knowingly and intelligently waived his right to testify notwithstanding the ambiguous end to the colloquy. We have no cause to reject that conclusion.

V

*Spelling Error and Substantial Evidence*

Defendant next claims all 32 convictions for violating a restraining order should be reversed for insufficient evidence because the one restraining order admitted into evidence spelled the protected party's name "Erica," while the person defendant was charged with illegally communicating within violation of the order, his wife, spells her name "Erika."

Defendant was charged in counts 20 to 52 with violating section 166, subdivision (c)(1) by contacting his wife Erika via various phone calls from jail and through numerous letters sent to her. Although there were three restraining orders against defendant, only one was admitted into evidence. That order, made on January 5, 2015, restrained defendant pursuant to section 136.2 from attacking a person with the same last name as defendant's wife, but whose first name was spelled "Erica."[12] Evidence was

---

[12] A March 3, 2015, restraining order correctly spelling the first name of defendant's wife as "Erika" was not admitted into evidence.

33

presented showing defendant contacted his wife numerous times after the order went into effect.

Section 166 defines and punishes various types of contempt of court. Subdivision (a) lists multiple forms of contempt which are misdemeanors "[e]xcept as provided in subdivisions (b), (c), and (d) . . . ." One such contempt is defined in subdivision (a)(4) as, "Willful disobedience of the terms, as written, of a process or court order or out-of-state court order, lawfully issued by a court, including orders pending trial." The provision defendant was convicted under, subdivision (c)(1), punishes among other things, the willful and knowing violation of a section 136.2 restraining order "by imprisonment in a county jail for not more than one year, by a fine of not more than one thousand dollars ($1,000), or by both that imprisonment and fine" notwithstanding subdivision (a)(4). (§ 166, subd. (c)(1)(A).)

Defendant contends the crime is defined by section 166, subdivision (a)(4), which requires a violation of the restraining order "as written." While that term is not present in the subdivision defendant was convicted under, subdivision (c)(4), defendant asserts provides for greater penalties for a subset of subdivision (a)(4) violations. Asserting any ambiguity in a penal statute must be construed in his favor (see *People v. Overstreet* (1986) 42 Cal.3d 891, 896 [describing rule of lenity]), defendant claims the unambiguous provision, subdivision (a)(4), controls. He concludes there is insufficient evidence to convict defendant because he did not violate the order as written because the person he contacted spells her name with a "k" rather than a "c."

California has abolished the presumption of identity of person from identity of name; the matter is now left to inference and the strength of the inference depends on whether the name is common or unusual. (*People v. Luckett* (1969) 1 Cal.App.3d 248, 253.) " 'The doctrine of idem sonans is that though a person's name has been inaccurately written, the identity of such person will be presumed from the similarity of sounds between the correct pronunciation and the pronunciation as written. Therefore,

34

absolute accuracy in spelling names is not required in legal proceedings, and if the pronunciations are practically alike, the rule of idem sonans is applicable.' [Citations.] The rule is inapplicable, however, under circumstances 'where the written name is material.' [Citations.]" (*Orr v. Byers* (1988) 198 Cal.App.3d 666, 669.)

When reviewing a claim of insufficient evidence to support a conviction, we review the record in the light most favorable to the judgment, to determine whether it discloses substantial evidence—evidence that is "reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66.) We draw all available inferences supporting the jury's verdict. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1382.) " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

At closing, the prosecutor admitted the misspelling and asserted it did not cause any possible confusion. Defense counsel also pointed out the misspelling, and the prosecutor argued on rebuttal that defendant knew he was not supposed to contact his wife, and any misspelling in the order was immaterial.

The restraining order in question also identified Erika by her last name, which was sufficiently distinctive to inform defendant that it was his wife whom he was not to contact. Defendant presents no authority, and we have no reason to conclude, that the term "as written" in subdivision (a)(4) of section 166 was intended to turn a protective order into a spelling test for the issuing court. Limiting violations to the order "as written" protects a person subject to the order from being trapped by an expansive ex post facto interpretation of the order, and to give the person adequate notice of what the order prohibits. Those concerns are not present here. There is no reasonable question that defendant's wife was the person protected by the order, and that he violated the order by

35

repeatedly contacting her. The jury could reasonably make this inference, and, in light of the arguments at trial, it did so. Substantial evidence supports the section 166 convictions.

## VI

### *Ineffective Assistance of Counsel*

Defendant contends trial counsel was ineffective in failing to inform the trial court that the report from Napa State Hospital corroborated his claim that he was not being given antipsychotic medications that returned his competency to stand trial.

Defendant's claim is based on a faulty premise. While the report states defendant was being administered a medication, valproic acid, when he was found competent by Napa State Hospital, the report did not state that this or any other medication was needed to restore or maintain competence. In addition, as has been discussed in detail, defendant was administered a medicine containing this drug when proceedings resumed after competency was restored. "Counsel is not ineffective for failing to make frivolous or futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) Such is the case here.

## VII

### *Cumulative Error*

Defendant's final contention is that cumulative error warrants reversal of his convictions. Since the only error here, the *Griffin* misconduct, was rendered harmless beyond a reasonable doubt through instruction, there is no error to accumulate, and his contention is therefore without merit.

## VIII

### *No Section 1001.36 Remand*

Defendant's final contention is that the matter should be remanded to allow the trial court to determine whether he should be granted pretrial diversion pursuant to section 1001.36.

"Section 1001.36 authorizes a pretrial diversion program for defendants with qualifying mental disorders. The statute defines ' "pretrial diversion" ' as 'the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment . . . .' (§ 1001.36, subd. (c).) The stated purpose of the diversion statute 'is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders.' (§ 1001.35, subds. (a)-(c).)

"As originally enacted, section 1001.36 provided that a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community." (Former § 1001.36, subd. (b)(1)-(6).) Section 1001.36 was subsequently amended by Senate Bill No. 215 (2017-2018 Reg. Sess.) (Senate Bill 215) to specify that defendants charged with certain crimes, such as murder and rape, are ineligible for diversion. (§ 1001.36, subd. (b)(2), as amended by Stats. 2018, ch. 1005, § 1.)

"If the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements and the defendant and the offense are suitable for diversion, and the trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then

37

the court may grant pretrial diversion. (§ 1001.36, subds. (a), (b)(3) & (c)(1).)"
(*People v. Frahs* (2020) 9 Cal.5th 618, 626-627 (*Frahs*).)

While section 1001.36 applies retroactively to all nonfinal convictions under the rule of *In re Estrada* (1965) 63 Cal.2d 740. (*Frahs, supra*, 9 Cal.5th at p. 624), the question remains as to which version of the law applies here.

Defendant could qualify for diversion under the original version of the statute, but no longer qualifies under the most recent version. Among the charged offenses that render a defendant ineligible are offenses subject to section 290 registration, section 314, and "Lewd or lascivious act on a child under 14 years of age." (§ 1001.36, subd. (b)(2)(B), (b)(2)(D).) Defendant was charged with (and convicted of) violations of sections 288.7 and 288, both of which are subject to mandatory registration under section 290 (§ 290, subd. (c)(1)), and the section 288 conviction also disqualifies defendant for the crime of lewd acts on a child under the age of 14.

Defendant claims application of the statute as amended is improper because statutes are presumed to apply prospectively (see *Frahs, supra*, 9 Cal.5th at p. 627) and conflicts with *Frahs*'s reasoning that the Legislature "could have regarded the preexisting criteria as adequate to protect public safety, at least until the new law took effect." (*Id*. at p. 636.) He further asserts application of the statute as amended to him would amount to a violation of the ex post facto clauses of the state and federal constitutions.

Two cases have addressed and rejected arguments similar to those made by defendant here. In *People v. McShane* (2019) 36 Cal.App.5th 245, review dismissed August 26, 2020, S257018, the defendant asserted: "(1) He is entitled to the benefit of the new diversion provisions, because they are ameliorative; however, (2) He is not subject to the even newer murder exclusion, because (a) it is not ameliorative, and (b) as applied to him, it would have a prohibited ex post facto effect." (*Id.* at p. 259.) The Fourth District Court of Appeal found the ex post facto and retroactivity questions closely intertwined. (*Id*. at p. 260.) Since section 1001.36 did not exist when defendant

38

committed his crime, applying to him an amendment rendering him ineligible from its benefits was not improper. "Here, when defendant committed the crime, he was not eligible for pretrial diversion, because Penal Code section 1001.36 did not yet exist. Now, he is not eligible for pretrial diversion, because of the murder exclusion. Thus, the enactment of the murder exclusion did not change the consequences of his crime as of the time he committed it. The fact (if it is a fact) that he was briefly eligible for pretrial diversion under Penal Code section 1001.36, as originally enacted, is irrelevant to the retroactivity analysis." (*McShane,* at p. 260, italics omitted.) The defendant, therefore, was not entitled to relief because he was ineligible under the amended statute. (*Id*. at p. 261.)

*People v. Cawkwell* (2019) 34 Cal.App.5th 1048, review dismissed August 26, 2020, S256113, likewise involved a defendant who was eligible under section 1001.36 as originally enacted but was convicted of an offense subjecting him to section 290 registration, rendering him ineligible under the current statute. (*Cawkwell* at p. 1051.) The *Cawkwell* court found, "because all relevant legislative activity occurred *years after* Cawkwell committed his offenses, he could not have relied on the prospect of receiving diversion when he committed his offenses. Thus, the amendment eliminating eligibility for sex offenders like Cawkwell is not an ex post facto law," and he was, therefore, ineligible for relief. (*Id*. at p. 1051.) In rejecting the defendant's claim that this result violated the prohibition against ex post facto laws, the Fourth District Court of Appeal found that diversion did not exist when the crimes were committed, and "the Legislature's amendment of section 1001.36 to eliminate eligibility for defendants charged with sex offenses did not make an act unlawful that was not formerly unlawful, nor did it increase the punishment for the offenses with which Cawkwell was charged. [Citation.]" (*Id*. at p. 1054.) The defendant was therefore ineligible for diversion. (*Ibid.*)

We are persuaded by both decisions. "[W]hether a new law is being applied retrospectively is closely intertwined with the question whether it is an unconstitutional

ex post facto law, because a finding that the law is being applied retrospectively is a threshold requirement for finding it impermissibly ex post facto." (*In re E.J.* (2010) 47 Cal.4th 1258, 1276.) Section 1001.36 did not exist when defendant committed his crimes. Applying the amended version to this case does not increase the punishment in effect when the crimes were committed and does not render formerly innocent behavior criminal. Accordingly, application of the current law to defendant does not violate the state or federal ex post facto prohibitions. Likewise, absent a specific legislative directive to the contrary, if ameliorative legislation applies retroactively under *Estrada*, then it is the most recent version of the legislation that is applied to the case. Since defendant is not eligible for relief under the current statute, his contention is without merit.

DISPOSITION

The judgment is affirmed.

\s\ ,
BLEASE, Acting P. J.

We concur:

\s\ ,
HULL, J.

\s\ ,
DUARTE, J.

40